No. 19,356.

LEON H. RABINOFF, ET AL. *v.* THE DISTRICT COURT IN AND
FOR THE CITY AND COUNTY OF DENVER, ET AL.
(360 P. [2d] 114)

Decided January 9, 1961.

March 27, 1961, on rehearing, original opinion adhered to.

226

Messrs. CREAMER & CREAMER, for petitioners.

Mr. FRED M. WINNER, Mr. WARREN O. MARTIN, Mr. THOMAS A. GILLIAM, for respondents.

*En Banc.*

Mr. Justice Doyle delivered the opinion of the Court.

Petitioners seek review by Writ of Certiorari, or in the alternative, prohibition. They challenge the jurisdiction of the district court of the City and County of Denver to hear condemnation proceedings instituted incident to the so-called Urban Renewal Program of the City and County of Denver. Numerous preliminary motions were filed by petitioners in the district court, all of which were denied. On the theory that there is no adequate remedy other than the instant writs, they have proceeded on the authority of *Swift v. Smith*, 119 Colo. 126, 201 P. (2d) 609, and *Old Timers Baseball Association of Colorado, et al. v. Housing Authority of the City and County of Denver, et al.*, 122 Colo. 597, 224 P. (2d) 219. The propriety of the procedure in the present circumstances is not questioned by the respondents.

The facts essential to a determination of the jurisdictional questions raised are contained in a stipulation which embraces everything relevant to the issues now presented.

The properties affected by the condemnation are located in an area comprising approximately 150 acres in the west part of Denver referred to as the Avondale Project. The petitioners are property owners whose homes or businesses are located within the limits of the Avondale Project, centering on West Colfax Avenue near Irving Street, the present location of Cheltenham School.

The legal authority for the present project is the act of the General Assembly, Colo. Sess. Laws 1958, Ch. 58, C.R.S. '53, 139-62-1, et seq., authorizing a municipality to take action looking to elimination of slum and blighted areas within its boundaries. This act recognized that such areas exist in municipalities of Colorado and found them to be injurious to the health, safety, morals and welfare of the people of the state. Section 4 of the act provides for the creation by the city of an Urban Re-

newal Authority charged with the duty of carrying out the purposes of the act. Pursuant to this authorization, the City and County of Denver created by ordinance the Denver Urban Renewal Project. The Authority and the City Council found as a fact that the Avondale Project area is a slum or blighted section within the meaning of the act. The litigation in the district court was instituted pursuant to Section 5 of the Urban Renewal Act, which authorizes the Authority to exercise the power of eminent domain.

Some, but not all, of the legal questions are related to the particular character of the properties sought to be condemned, and consequently it becomes necessary to recite those stipulated facts which throw light on the nature of these properties.

The stipulation discloses that the Authority proposes to acquire a substantial part, but not all, of the properties in the Avondale Project by either purchase or condemnation and thereafter to sell a substantial part of the properties to private enterprises for the purpose of redevelopment for residential, commercial or industrial uses pursuant to and consistent with the Urban Renewal Act. Some of the properties are to be used for public purposes such as streets, parks or schools, but it would appear that most of the property will be sold to private enterprises or to individuals for private development. The stipulation pinpoints this aspect of the problem. " * * * It is agreed that when the Project, if allowed to proceed, is completed, most of the lands will be in use for purposes similar to those private purposes that now exist, and there is no factual dispute as to this use, but is a legal question as to the permissibility of condemnation of the property for development for such private uses. * * * "

The parties agree that the properties in question are not slums in the sense that the entire area is in disrepair or deterioration. On the other hand, it would appear from the exhibits that the area poses a future hazard to

the health and welfare of the community. Some allegedly do not comply with the Denver Health and Safety Ordinances, while others are conceded to be in full compliance with these ordinances. There are both residential and commercial uses in the area and some of the properties are combined residential and commercial. It is said that the properties sought to be condemned constitute a fair cross-section of those to be found within the Avondale Project from the standpoint of type and of condition. It is agreed by both parties that the condemnations in question are not based upon any non-compliance with the mentioned health and safety ordinances. Much of the money to be used for the carrying out of the project is to be furnished by the federal government, and there is some question as to whether the monies available are adequate to permit acquisition of all of the properties, in which event some of the properties may not be acquired because of lack of funds. No doubt this is brought out in the stipulation as suggesting a threat of discriminatory judgment by the Authority. This fact is also offered as bearing upon whether limitation of funds available to negotiate, may invalidate the project because of its tendency to prevent acquisition.

There are specific stipulations which reveal somewhat the condition of the particular properties which are here sought to be condemned. The agreement with respect to these is set forth as follows in paragraphs 12 to 15 inclusive:

"12. As to the property of the Respondents, Hartman, it is combined commercial and residential property, and there is no claim made by the officials of the City and County of Denver that the property is not in substantial compliance with all applicable City Health and Building Ordinances.

"13. As to the property of the Respondents, Medina, it is residential, and there is a claim made by the officials of the City and County of Denver, that the property

does not comply in major particulars with all City Health and Building Ordinances.

"14. As to the property of the Respondents, Haney, it is residential, and there is a claim made by the officials of the City and County of Denver that the property does not comply in all respects with City Health and Building Ordinances.

"15. The property of the Respondents, Rabinoff, is combined commercial and residential, and there is a claim made by the officials of the City and County of Denver that the property does not comply in all respects with City Health and Building Ordinances."

Numerous documents have been received in evidence and are part of the record before us. Included are exhibits offered by the Urban Renewal Authority to establish the legal basis for its existence; exhibits pertaining to the creation of the Avondale Project; and a publication of the Denver Planning Office entitled "The Denver Comprehensive Plan," which describes the area embraced within the Avondale Project.

Three general groups of questions have been raised by the motions of the petitioners. The first group pertains to the validity of the entire urban renewal program; the second involves the validity of the Denver Urban Renewal Authority; the third questions the validity of the Avondale Project.

It is the principle contention of petitioners that the Urban Renewal program constitutes the taking of private property for private uses and that such taking is not permissible under the Colorado Constitution. Petitioners seek to draw a distinction between public use and public purpose, claiming that only a taking for a public use is permitted in this state. They contend that the determination that a taking is for a public use is a matter for ultimate resolution by the courts and not dependent on legislative pronouncement. They further argue that the police power may not be set up as an independent source of authority for a taking such as

that sought in this case in order to circumvent the constitutional restrictions on public condemnation.

With respect to the Urban Renewal Authority of Denver, the petitioners contend that the statute and ordinances authorizing it are void, since they violate the Constitution, particularly Article XX, and the Charter of the City and County of Denver. The basis for this contention is that conferral of power on the authority constitutes an unlawful delegation of power; that the condemnation authority has been granted to the city by Article XX of the Constitution, thus rendering state delegation to this agency a nullity.

Apart from the constitutional challenge to the statute and the establishment of the Urban Renewal Authority, the Avondale Project itself is attacked as not having been initiated in compliance with the statutory requirements. Specifically, it is asserted that the requisite notice and hearing required by the statute and due process of law were not had. In addition, it is contended that a general plan for the City of Denver is required before such a project may be undertaken and no such plan existed.

Finally, petitioners argue that it is clear on the face of the record that the statutory requirement of negotiation before condemnation cannot be met in view of the stipulated fact that there may be insufficient federal funds available to meet this requirement in good faith.

I.

*Does the Urban Renewal law, considered in the light of the action taken by the City and County of Denver and the Urban Renewal Authority of Denver, violate Article II, Sections 14 and 15 of the Constitution of Colorado and constitute the taking of private property for a private rather than a public use?*

The petitioners argue that the act in question is devoid of public purpose and public use; that by authorizing the taking of private property, the demolishing of buildings thereon, the reselling to private persons with re-

strictions, it is not a public use as contemplated by the cited provision of the Colorado Constitution. It is said that this is a giant private real estate development designed to take private property from one group of individuals for the purpose only of vesting it in a different group. The present efforts are compared to the sequestration of property by Henry VIII. On this it is said:

"It is strange to find abhorred historic parallels reenacted in our own polity, without even being recognized. No difference obtains at all between the policy whereby in Medieval and Renaissance periods lands were redistributed or sequestered for the benefit of those who enjoyed state favor at the moment, and this procedure, whereby the lands of the many are taken deliberately to be redistributed to and agglomerated in the hands of the few, because the uses as so agglomerated concur more completely with the notions of the supra-governmental 'planners' as to what is good for the community."

The Constitution, Article II, Section 15, restricts the power of eminent domain to takings for public use except for private ways of necessity and for reservoirs and other named purposes. It is said that this provision restricts and limits the power to be exercised thereunder so as to rule out the type of legislative scheme now before us involving, as it does, reconveyance to private persons.

The narrow inquiry, therefore, is whether the power of eminent domain can be exercised in circumstances such as the present, wherein the public authority does not intend to permanently retain the property which it proposes to condemn. We do not consider the actual use by the public after the taking to be the appropriate test as to whether or not the use is a public one. The main object of this legislation is to eliminate slum and blighted areas as defined in the act. Such areas are defined by the act as:

"(8) 'Slum area' shall mean an area in which there

is a predominance of buildings or improvements, whether residential or non-residential, and which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire or other causes, or any combination of such factors, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime, and is detrimental to the public health, safety, morals or welfare.

"(9) 'Blighted area' shall mean an area which by reason of the presence of a substantial number of slum, deteriorated or deteriorating structures, predominance of defective or inadequate street layout, faulty lot layout in relation to size, adequacy, accessibility or usefulness, insanitary or unsafe conditions, deterioration of site or other improvements, unusual topography, defective or unusual conditions of title rendering the title non-marketable, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs or arrests the sound growth of the municipality, retards the provision of housing accommodations or constitutes an economic or social liability and is a menace to the public health, safety, morals or welfare in its present condition and use."

The General Assembly has selected a method whereby the object shall be accomplished not by public ownership of the land but rather through private endeavor and ownership under the direction of authorized officials. The acquisition and transfer to private parties is a mere incident of the chief purpose of the act which is rehabilitation of the area. The point petitioners urge has been raised in numerous cases and resolved contrary to their contention. Thus in *David Jeffrey Co. v. City of Milwaukee,* 267 Wis. 559, 66 N.W. (2d) 362, the Wisconsin Court considered whether the taking of private prop-

erty pursuant to an urban renewal act constituted a taking for a public use. The opinion pointed out that the right of eminent domain can be exercised in Wisconsin as in Colorado only in connection with the taking of private property for public *use*. It, nevertheless, was concluded that the fact that the property would not continue to be owned by the city did not mean that the use was not a public one. The Court relied on the following: *Foeller v. Housing Authority of Portland,* 198 Ore. 205, 256 P. (2d) 752; *Zurn v. City of Chicago,* 389 Ill. 114, 59 N.E. (2d) 18, and *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 54 Atl. (2d) 277. All of these cases emphasize that the acquisition of properties and the elimination of their slum or blighted character constitutes a public purpose; that what is involved is an urban reclamation project; and the fact that when the redevelopment is achieved the properties are sold to private individuals for the purpose of development does not rob the taking of its public purpose. The Wisconsin Court concluded:

"We consider the acquisition of property pursuant to provisions of sec. 66.43, Stats., for the purpose of eliminating blighted areas and preventing the spread and recurrence of blight conditions in such areas, the removal of structures and improvements of sites, the sale or leasing of property for redevelopment incidental thereto and with restrictions to prevent recurrence of blight, are for public uses and purposes for which the power of eminent domain may properly be exercised. We find that the statute, sec. 66.43, in these regards does not contravene the constitutional provisions suggested on this appeal. The city of Milwaukee may acquire and assemble areas to carry out the purposes of the statute, and may contract with respect to property acquired under authority of it, and lease or sell such property to private persons or redevelopment corporation in manner as provided by the statute."

The Supreme Court of the United States considered

similar arguments in upholding a similar act which had been adopted by the Congress of the United States for the benefit of the District of Columbia. Although the constitutional restriction is different, the reasoning of the Supreme Court is persuasive in that it emphasizes that the ultimate private ownership aspect does not render the scheme invalid. In disposing of this contention, the Supreme Court said: (*Berman v. Parker*, 348 U.S. 26, 99 L. Ed. 27, 75 S. Ct. 98) " * * * Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. See *Luxton v. North River Bridge Co.*, supra; cf. *Highland v. Russell Car Co.*, 279 U.S. 253. The public end may be as well or better served through an agency of private enterprise than through a department of government — or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. * * * "

An annotation in 44 *ALR 2d* 1414 collects the numerous state court decisions upholding urban renewal statutes against contentions similar to those advanced in the case at bar. The high courts of 26 states have upheld such statutes. On the other hand, a decision of unconstitutionality has been reached in only two states, Florida and South Carolina. See *Adams v. Housing Authority of City of Daytona Beach*, 60 So. (2d) 663 (Fla.); *Edens v. City of Columbia*, 228 S.C. 563, 91 S.E. (2d) 280. In Georgia a constitutional amendment was adopted following the Court's decision in *Housing Authority of the City of Atlanta v. Johnson*, 209 Ga. 560, 74 S.E. (2d) 891. See *Bailey v. Housing Authority of Bainbridge*, 214 Ga. 790, 107 S.E. (2d) 812.

The underlying philosophy which gives character to

the argument that the use is a public one is well described in Horack and Nolan, *Land Use Controls,* p. 225. The authors explain the objections and reasons in support of urban renewal as follows:

"The reasons are many. Structures, like machines and people, wear out. Sound structures, if not maintained, become unsanitary, unsafe, and unsightly. Assessed valuations of such buildings decline rapidly but income may actually increase if landlords with lower taxes make no repairs and over-crowd the dwellings. The physical characteristics of neighborhoods may accelerate decline, or changing patterns of the community may isolate an area. Economic factors resulting from isolation, rising standards of living, attitudes created by advertising, all may depress some areas while creating demand for location in others. Political factors add to the problem. As an area deteriorates the cost of municipal services in the area increases and the tax revenue declines. Therefore the city tends to neglect the streets, omit garbage and trash collection, and refuse to extend sewer, water, and other utilities. The end of the cycle is an established social pattern of neglect which makes the area habitable only for those who must or do accept the lowest living standards. In result, the area is a slum. The structures are beyond economic repair. The district is a burden to the community economically. Its population is a source of immorality, juvenile delinquency, disease, and high public welfare demands. Rejuvenation is impossible. Removal of structures by public or private nuisance proceedings has failed. The occasional 'wrist slapping' fine for violation of health, sanitary, fire, or safety ordinances does not repair the buildings or improve the living conditions of the people. Urban population has increased more rapidly than urban building and this has made the removal of the slum dweller a political and physical impossibility."

The comments in a note entitled *Urban Renewal: Problems of Eliminating and Preventing Urban Deteri-*

*oration,* 72 Harv. L. Rev. 504, 519, 520, 521, also furnish explanations for emphasis of the public objects rather than actual occupation as the criteria in determining validity of the method adopted by the Assembly. Cf. the comments of Haar, *Land Use Planning,* 444, 445.

■ In concluding that the proposed action is public and not private, we are persuaded not only by the underlying object of urban renewal, but the significant fact that the grant is to a public agency which acquires the lands in question under a master plan of rehabilitation. The factor of ultimate ownership by private individuals is an incidental and secondary consideration to the public objectives. In the light of these considerations, we conclude that a violation of sections 14 and 15 of Article II of the Colorado Constitution is not shown.

II.

*Does the fact that the buildings here in question are not in an extremely dilapidated condition render the statute inapplicable or its application invalid?*

■ The definitions of slum and blighted areas contained in Section 3 (8) and (9) of the act are sufficiently broad to include the Avondale area. A slum area is one which by reason of dilapidation, deterioration, age, obsolescence, insufficient light, air, sanitation or overcrowding so as to create a fire hazard or to constitute a menace to the health, safety, morals or welfare of the community. A blighted area is somewhat more broadly defined as one which by reason of a substantial number of slum *deteriorated* or *deteriorating* structures or by reason of inadequate street layout endangers life or property, retards the growth of the community, constitutes a social or economic liability, etc.

In view of the scope of these definitions, it is not essential that the properties affected shall be in a state of disrepair calling for condemnation as nuisances. The cases which have considered the present issue point out that the approach to urban redevelopment cannot be on a structure to structure basis, inconsistent with its basic

objectives. A full discussion of this identical point appears in 44 ALR 2d 1433. The author concedes that there is a strict viewpoint in some of the cases that the area must be one which has deteriorated rather than one which is in the process of deteriorating. Most of the decisions, however, take a more liberal view and hold that the authority is not powerless to prevent deterioration.

In the case of *Berman v. Parker,* supra, the Supreme Court in upholding the statute recognized that it applies not only to out and out slums but that it has other objects equally valuable, and that these objects are also within the power of the legislative and administrative authorities. The Supreme Court concluded:

" * * * In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."

In the case at bar the City Council and the Urban Renewal Authority would appear to have carefully considered the pros and cons of undertaking renewal of the Avondale section prior to determining that it was properly subject to the act. There is no indication from the record before us that their action was arbitrary or capricious. There is an express finding in the authorizing ordinance that the area included within the Avondale Project is slum and blighted. This finding is as follows:

"WHEREAS, the Local Public Agency has made detailed studies of the location, physical condition of structures, land use, environmental influences, and the social, cultural, and economic conditions of the Project area and has determined that the area is a combination of a slum and blighted area and that it is detrimental and a menace to the safety, health, and welfare of the inhabitants and users thereof and of the Locality at large,

because of: a serious and growing menace, injurious to the public health, safety, morals and welfare of the residents of the Locality; that the existence of such area contributes substantially to the spread of disease and crime, constitutes an economic and social liability, substantially impairs or arrests the sound growth of the Locality, retards the provision of housing accommodations, aggravates traffic problems and impairs or arrests the elimination of traffic hazards and the improvement of traffic facilities; and that such area is a focal center of disease, promotes juvenile delinquency, and consumes an excessive proportion of its revenues because of the extra services required for police, fire, accident, hospitalization, and other forms of public protection, services and facilities; and the members of this Governing Body has been fully apprised by the Local Public Agency and are aware of these facts and conditions; and * * * "

The fact shown by the stipulation that there are not widespread violations of building and health ordinances, does not of itself establish arbitrariness on the part of the responsible authorities.

We must conclude therefore that the facts before us are not inconsistent with the statutory definitions and further that the condition of the properties does not render the particular plan an unconstitutional taking. We are not unmindful of the individual hardship nor are we unsympathetic toward it. On the other hand, it was within the power of the Assembly to determine that the public interest outweighs these considerations. Moreover, our approval of the general principle underlying the program of urban renewal and its application in the case before us, to the extent that this application is apparent in these threshold motions, should not be taken to mean that scrupulous adherence to legal requirements will not be expected in this case and in future projects. Serious harm could result from an arbitrary exercise of the urban renewal power, but wisely used it promises

to be the source of great good to the urban communities of Colorado.

## III.

*Does the Urban Renewal Act violate Article XX, the Home Rule Provision, of the Constitution of Colorado, by attempting to empower the authority to perform duties which are in their character local and municipal and which have been vested in the city?*

■ The case of *People, ex rel. Stokes v. Newton,* 106 Colo. 61, 101 P. (2d) 21, is authority for the principle that the state may, in the absence of local legislation, adopt a uniform statewide legislative program even though the subject has a local or municipal character where the municipality has not acted. Here the state, pursuant to the United States Housing Act adopted by the Congress of the United States, enacted a statute authorizing cities to engage in slum clearance and housing projects. Included in the powers granted to cities of the first class was the right to exercise eminent domain. In an *en banc* decision (opinion by Mr. Justice Bock), the Court held that the statute establishing a Housing Authority for the City of Denver did not constitute an invasion of the constitutional powers of the city. The Court proceeded on the premise that the subject matter was local, but nevertheless held that the state had authority to regulate it until such time as the city itself assumed to exercise the power. The pertinent language of the opinion is as follows:

"Relator's theory is that the state has lost all jurisdiction over a home-rule city in matters of local and municipal concern. The theory is untenable. Paragraph (h), section 6, of article XX provides, inter alia: 'The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters.' As already stated, Denver has not amended its charter so as to take advantage of the provisions of the National

Housing Act. There is no contention that the present charter forbids such action. Assuming, but not deciding, that the authority granted to Denver by chapter 131, supra, is a matter of local concern, and there being no question that, except for article XX, supra, action thereunder is a proper exercise of the police power of the state, Denver not having exercised the authority to legislate by amending its charter, the state law controls."

The parallel between the *Newton* case and the case at bar on this question is almost complete. The Urban Renewal Authority is in the same relative position as was the Denver Housing Authority in the *Newton* case. Here, as in the *Newton* case, the City of Denver has not asserted any authority under Article XX to legislate in this field. On the contrary, it has consented to the exercise of legislative jurisdiction by the state.

Under the circumstances, we perceive no merit in the argument that the legislation here in question is in conflict with Article XX of the Constitution.

IV.

*Are there procedural defects incident to the creation of the Urban Renewal Authority or in connection with the adoption of the Avondale Project itself or the Denver Comprehensive Plan?*

A. Contrary to the contention of the petitioners that the petition is inadequate in failing to specifically set forth the authority under which the action was undertaken, we conclude that the source of the authority is adequately identified and that it sufficiently complies with the general condemnation statute, C.R.S. '53, 50-1-2. See *Lavelle v. Julesberg,* 49 Colo. 290, 112 Pac. 774.

B. It is said that the "Denver Comprehensive Plan" does not satisfy the requirement of the statute subsection (1) of section 7. It is pointed out, however, by counsel for the respondents that Exhibit C, which is part of this record, is in fact the Denver Comprehensive Plan. Our attention is also called to the fact that a public notice was given of the filing of the plan and furthermore

it was recognized as such by the City Council. The further contention that such a plan is invalid unless prepared by the Zoning Commission is equally untenable. Section 219A of the Charter is not applicable to the comprehensive plan prepared by the Denver Planning Office as a prerequisite to the instant undertaking.

C. We see no merit in the other procedural arguments that the hearings were insufficient or that the required notices were not adequate. The comments of counsel with respect to the adequacy of the notice and the hearing are conclusions which do not establish their invalidity.

D. The argument that the stipulated fact that there "may be insufficient money to permit the acquisition of all of the properties by negotiation or condemnation" violates the condemnation statute which requires failure to agree on compensation prior to condemnation proceedings, is without merit. The possibility that such injury might develop is not sufficient. On the other hand, the door is not hereby closed to a showing of arbitrary or capricious action as this project develops. See *Post Printing Co. v. Denver,* 68 Colo. 50, 189 Pac. 39.

V.

*Are the petitioners denied equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States?*

The final argument of petitioners is that a threat of arbitrary action as between property owners is present; that this is brought to light by the stipulation that some of the properties in the area may not be subjected to the condemnation, destruction and rehabilitation process. This same issue was considered in *Berman v. Parker,* supra, and was also raised in *Robinett v. Chicago Land Clearance Commission* (D.C.) Ill., 115 Fed. Supp. 669, and in *Redevelopment Agency of San Francisco v. Hayes,* 122 Cal. App. (2d) 777, 266 P. (2d) 105. The fact that particular decisions will have to be made does

not support a conclusion that such decisions will prove to be arbitrary.

There being nothing presented here to justify our interference with an orderly determination of the issues involved by the district court, the Rule to Show Cause heretofore issued is discharged.

MR. JUSTICE MOORE and MR. JUSTICE FRANTZ dissent.

MR. JUSTICE McWILLIAMS, not a member of the court when the opinion was originally announced, having heard and considered the argument presented on rehearing, concurs in this opinion.

MR. CHIEF JUSTICE HALL, formerly not participating, dissents.

MR. JUSTICE MOORE dissenting:

The opinion of the majority, as I view it, is so heavily weighted in the direction of unrestrained exercise of totalitarian and potentially tyrannical power by those in positions of governmental authority, and so repugnant to the letter and spirit of specific constitutional limitations upon the exercise of governmental power that I must dissent. A wholesome respect for the judgment of the bar and the public at large requires that I set forth the broad outline of my objections to the majority opinion. While volumes might be written in justification of my position I shall attempt to do no more than pinpoint a few of the many valid objections which I find in the court's conclusions and the arguments advanced in support thereof.

I am primarily interested in the protection of constitutional limitations upon the power of any man, or group of men, to govern the people. This involves the preservation of individual freedom of action, and individual liberty, of which we talk so much and concerning which we do so little. With every passing year, by judicial opinions of the kind to which I now dissent, we nibble

upon and whittle away the freedoms of the people; subjecting them more and more to unreasonable restraints, compelling compliance with governmental commands which are far in excess of any powers constitutionally authorized.

On March 4, 1939, at a solemn ceremony in Washington, D. C., in commemoration of the 150th Anniversary of the convening of the First Congress under the Constitution, the then Chief Justice of the Supreme Court, Charles Evans Hughes, said, concerning the purpose of the constitution:

"We protect the fundamental rights of minorities, in order to save democratic government from destroying itself by the excesses of its own power. The firmest ground for confidence in the future is that more than ever we realize that, while democracy must have its organization and controls, *its vital breath is individual liberty.*"

With this significant thought in mind I direct attention to some of the provisions of the Colorado Constitution which I think are violated and are to be frittered away by the court's opinion in this cause.

Article II, Section 3: "All persons have certain natural, essential and *inalienable* rights, among which may be reckoned the right * * * of acquiring, *possessing* and *protecting* property * * *."

Constitutional qualifications of this inalienable right are to be found in Article II, Section 15, and Article II, Section 14, as follows: "Private property shall not be taken or damaged for public or private *use* without just compensation; * * * and whenever an attempt is made to take private property for a *use* alleged to be public, the question whether the *contemplated use* be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the *use* is public." (2) "Private property shall not be taken for private *use unless by consent of the owner,* except for reservoirs, drains, flumes or ditches on or

across the lands of others, for agricultural, mining, milling, domestic or sanitary purposes." (Article II, Sec. 14.) (In the instant case no one contends that any of the above exceptions are applicable.) (3) "No person shall be deprived of life, liberty or property without due process of law."

In the instant case there can be no question concerning the "use" which will be made of the property in dispute. It is undisputed that it will be turned over forthwith to new private ownership for promotion and exploitation. The property may even be continued in operation, under the new forced ownership, as it is at present, or it may be devoted to other private uses as determined by the new owners. The "contemplated use" within the meaning of Article II, Sec. 15, most certainly does *not* include the right of the public to make *use* of the property in any manner whatever, and it may not be expanded to include its sale to new private owners for the operation of private uses.

Under the act being considered the Urban Renewal Authority is given discretionary power of the most fantastic nature which could be exercised in a most arbitrary manner. To acquire *without the consent of the owner* the private property of untold thousands of citizens. And this may be accomplished notwithstanding that the "contemplated use" to be made of the property completely excludes the public, and on the contrary involves a private use and development of a kind to be bargained for, said *use* to be carried on for private profit! Vast amounts of public funds are to be expended in forcing unwilling owners of real estate to convey their property, even though such property in no way whatever threatens to the public health, safety or morals. The Urban Renewal Authority then conveys the property to private interests who undertake to create an atmosphere in the area purchased which is more to the liking of those who occupy the seats of power in the new dictator agency. These private interests, introducing new, or con-

tinuing the old private uses, anticipate a profit. Thus the state plunges into the business of underwriting and financing private transactions in real estate and land development as a partner of those who speculate in real estate ventures, and in land development, for profit.

If the above-quoted provisions of the constitution are impotent to prevent this socialistic plunge by the state into financial partnership with specially selected real estate promoters and developers of subdivisions who thereby acquire privately owned property without the consent of the owners, with the avowed purpose of putting to private uses for profit, then the constitution is dead in so far as it purports to assure the citizens that they have the "inalienable" right "of acquiring, possessing and protecting property." If countless thousands of property owners in practically any section of the city which happened to be conveniently "old" can thus be compelled to surrender their property to new purchasers for uses strictly private, we should discontinue the pretense that individual freedom of choice in matters pertaining to property has any constitutional protection against a tyrannical exercise of governmental power. If, as the majority opinion holds, the constitution is impotent in the instant situation then there is no point at which extreme encroachments upon rights guaranteed by the constitution can be stopped, since no grandiose multimillion dollar project can be conceived which would not carry with it some incidental or colorable public purpose.

It is usual and customary for those who seek to water down the effectiveness of the constitution as a bulwark of strength protecting individual freedom of action to claim some benefit to the public if the loss of individual liberty is sustained. It is true that no rights are absolute. However, I insist that "nothing is better settled than that the property of one individual cannot, *without his consent,* be devoted to the *private use* of another, even when there is an incidental or colorable benefit to the

public." *Housing Authority v. Muller,* 270 N.Y. 333 (342), 1 N.E. (2d) 153, 105 A.L.R. 905.

The police power of the state is altogether adequate if properly employed to remove, or to abate a "slum area" or a "blight area." By express constitutional provision it is provided that unless the *use* to be made of slum area property acquired through condemnation is a *use by the public,* or an agency of the public, resort to the police power is the only constitutional method by which the "slum" or the "blight" can be cured. In the instant case the police power has not been resorted to, and it is in no way involved in the controversy. It should not be confused with the power under which private property may be condemned for public use, or for private uses in the very narrow field specifically mentioned in the constitution. The police power affords an adequate constitutional remedy to state government to protect the public health, safety and morals of the people from the evils of "slum" or "blight" areas. This power has not been used in the area here involved, and it is admitted that much of the property included in the area involved is being occupied and maintained in conformity with all requirements of the law which are specifically designed to protect the public health, safety and morals.

Under the holding of the majority there are few areas in the city of Denver which would not be subject to aggregate acquisition by the all-powerful Urban Renewal Authority, whether the owners of homes or business property located therein consented to being dispossessed or not. Thus, area by area, the homes and small businesses of property owners would be turned over to private real estate developers and put to a private use for profit upon the spurious claim that the public would reap some colorable benefit from such operations, conducted under the super-intelligence of those occupying the positions from which the decrees are issued, the effect of which is to dispossess thousands of citizens of privately owned property. Every property owner and

small businessman in those very large, but nonetheless substantial, areas of the city occupied by the middle and lower income groups of our population, are to be immediately vulnerable to the dictates of a very small group of men who purport to act (as claimed by the majority opinion) to serve a "public purpose" in bringing about the removal of a "slum" area. The language of the Constitution of Colorado cannot be construed to include anything other than that which the words employed, when given their generally accepted interpretation, will imply. At no place in the constitution can the authority be found for taking of private property for private use upon the supposition that some incidental or colorable "public purpose" may be served thereby. The constitution uses the term "contemplated use" and says that this must be a public *use,* and a public use cannot mean anything other than a *use* by the public. The words "purpose" and "use" are not synonymous terms. "Purpose" has to do with motivation and is an intangible thing. "Use" has nothing whatever to do with motivation but refers to the direct means employed in carrying out an objective and is a tangible thing. "Contemplated use" in this case can only refer to that which will actually be done with the property itself.

I respectfully submit that the majority opinion in this case has, by judicial action, amended Article II, Section 14, to read as follows:

"Private property shall not be taken for private use, unless an authorized governmental agency shall decree that some incidental or colorable public purpose will be served by the contemplated private use of the property * * *."

The only escape from this conclusion would be to conclude that all the dictionaries should be rewritten to make the words "purpose" and "use" synonymous.

The Constitution of Colorado was created for the protection of minorities, for the protection of the individual against tyrannical rule. The fact that there may be a

substantial clamor (largely contributed to by those who expect to profit from the scheme) for the sacrifice of individual liberty to advance private interests, does not mean that the constitution is ineffective to prevent the sacrifice.

Progress in this field should be and can be achieved within the framework of the constitution. The failure of local authorities to use the police power to eradicate "slums" adversely affecting the public. health, safety or morals does not warrant a judicial abandonment of the constitutional guaranties relating to property rights. As stated by Chief Justice Hughes, the "vital breath" of our way of life is the individual freedom of the citizen to act with a minimum of governmental compulsion.

I can have no part in tightening the screw of the garrote choking off this "vital breath" so essential to our way of life, whether the process is accomplished by inches at a time, or by the headlong plunge toward repudiation of constitutional limitations upon power to govern which I sincerely believe will result from the majority opinion in this case.

MR. JUSTICE FRANTZ concurs in the views hereinabove expressed.

MR. CHIEF JUSTICE HALL, who did not participate in the original hearing, joins in the dissent of MR. JUSTICE MOORE.

MR. JUSTICE FRANTZ dissenting:

My first impressions of this controversy, admittedly amorphous and indefinite, have become, after considerable research and reflection, convictions. These convictions constrain the adoption of the view that the Urban Renewal Law, as applied to this case, is invalid as being in contravention of the Constitution of Colorado.

Those of this court who deem the law consonant with the Constitution of this state and those who believe it

sets the authority of this fundamental document at naught are equally in favor of progress and advancement. Our differences arise from considerations of the general good as opposed to those of the individual as they are expounded and made the subjects of rights and duties in the Constitution. The collision of doctrinal thought involves the primacy of the majority and the subordination of the individual, and, as in this case in some of its phases, a minority.

The Preamble to the Constitution mentions a number of purposes for forming a state government. Among these purposes we find that in order to "promote the general welfare and secure the blessings of liberty to ourselves and our posterity" we "do ordain and establish this constitution for the 'State of Colorado.'" Here is an admixture of the general good and the liberty of the individual cherished as an attainable goal in the formation of a government.

Article I describes the boundaries of the state. It is followed by the Bill of Rights, which in part reads as follows:

"In order to assert our *rights,* acknowledge our *duties,* and proclaim the *principles* upon which our government is founded, we declare:

"Section 1. Vestment of political power. — All political power is vested in and derived from the people; all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the *good of the whole.*

\* \* \*

"Section 3. Inalienable rights. — All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and *liberties;* of *acquiring, possessing* and *protecting* property; and of seeking and obtaining their safety and happiness.

\* \* \*

"Section 14. Taking private property for private use.

—Private property *shall not be taken for private use* unless by consent of the owner, except for private ways of necessity, and except for reservoirs, drains, flumes or ditches on or across the lands of others, for agricultural, mining, milling, domestic or sanitary purposes.

"Section 15. Taking property for public use — compensation, how ascertained. — Private property shall not be taken or damaged, for public or private *use*, without just compensation. * * * whenever an attempt is made to take private property for a use alleged to be public, *the question whether the contemplated use be really public shall be a judicial question*, and determined as such without regard to any legislative assertion that the use is public.

\* \* \*

"Section 25. Due process of law. — No person shall be deprived of life, liberty or property, without due process of law.

\* \* \*

"Section 28. Rights reserved not disparaged. — The enumeration in this constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people." (Emphasis supplied.)

Obviously, the framers of this document, in declaring that government "is instituted solely for the good of the whole," envisioned the "good of the whole" as recognizing and preserving certain rights of individuals as inherent and inalienable, among which is the right "of acquiring, possessing and protecting property." This right to acquire, possess and protect property is so fundamental that it gives way only where property is needed for a public use, and in specific instances for a private use, but the taking in such cases requires that the owner be justly compensated. The fee simple of the individual's right to acquire, possess and protect property transcends all the powers of the majority, or of the government, to abridge or deny it, and only where eminent domain is properly exercisable must the individual's power yield.

Placing the Bill of Rights immediately after Article I, defining the boundaries of the state, establishes the pre-eminence of these rights in the order of constitutional commands. Before other provisions were formulated for adoption, it must be made certain that the individual rights of man be recognized and preserved. Investiture of governmental power and of the rule of the majority shall be made only after certain natural, essential and inalienable rights of the individual are indelibly inscribed in the Constitution in such manner as will assure that their integrity remains intact.

"The term 'Bill of Rights' is derived primarily from the 2 St. W. & Mary, ch. 2, and it was so called because that statute declared the true rights of the British subject. * * * The object of that statute as well as of other British statutes of a like kind subsequently passed from time to time, and also of the charters of the same caste obtained from the king, was avowedly that, at the same time that they should operate as a *limitation upon the powers of the crown*, they should effectually *secure from encroachment from any quarter the ascertained and declared rights of the subject.* Thus these give the original of the true idea of the legitimate office of a Bill of Rights." (Emphasis supplied.) *Eason v. State,* 11 Ark. 481.

"An American bill of rights is a declaration of *private rights reserved* in a grant of public powers, — a reservation of a limited *individual sovereignty*, annexed to and made a part of a limited form of government established by the independent, individual action of the voting class of the people. The general purpose of such a bill of rights is, to declare those fundamental principles of the common law, generally called the principles of English *constitutional liberty*, which the American people always claimed as their English inheritance, and the defense of which was their justification of the war of 1776." (Emphasis supplied.) *Orr v. Quimby,* 54 N.H. 590.

In 1958 the Legislature enacted the Urban Renewal

Law. By Section 2 it found and declared "that there exist in municipalities of the State slum and blighted areas which constitute a serious and growing menace, injurious to the public health, safety, morals and welfare of the residents of the State in general and of the municipalities thereof." Section 2 concludes with the finding and declaration "that the powers conferred by this Act are for *public uses and purposes* for which public money may be expended and *the police power exercised;* and that the necessity in the public interest for the provisions herein enacted is hereby declared as a matter of legislative determination." (Emphasis supplied.)

The Urban Renewal Law provides for the removal of slum and blighted areas "and for the prevention of the development or spread of slums and blight." Secs. 3 and 5. A "slum area" involves the *predominance* of certain buildings or improvements in an area which are of a condition or combination of conditions as constitute a detriment "to the public health, safety, morals or welfare." Sec. 3 (8). A "blighted area" involves a *substantial* number of certain structures, and the presence of other conditions, all of which "substantially impairs or arrests the sound growth of the municipality, retards the provision of housing accommodations or constitutes an economic or social liability and is a menace to the public health, safety, morals or welfare in its present condition and use." (Sec. 3 (9).

Property may be acquired in any of the usual ways by which the acquisition of property is accomplished, including condemnation under the power of eminent domain. Sec. 5. The property so acquired as a part of an urban renewal project may be transferred to a private land developer. Sec. 6.

Police powers and the power of eminent domain are commingled in the Act without due regard to their differences in the causation that moves their exercise or the effects proceeding from the exertion of these powers.

Under the exercise of the right of eminent domain private property is taken for public use and the owner is invariably entitled to compensation therefor. Eminent domain is a reserved right, an expressed attribute of sovereignty, which, however, recognizes the right of the owner by compensating him for the taking.

The police power arises from a different source, and is part of the unwritten law. It is founded in the maxim "sic utere tuo ut alienum non laedas," — that every property owner must so use his own as not to endanger the safety, health, morals and general welfare of the community in which he lives.

*Mugler v. Kansas,* 123 U.S. 623, 8 S. Ct. 273, 31 L. Ed. 205; *Belleville v. St. Clair County Turnp. Co.,* 234 Ill. 428, 84 N.E. 1049, 17 L.R.A.N.S. 1071; *Cincinnati, etc., R. Co. v. Connersville,* 170 Ind. 316, 83 N.E. 503, are decisions which clearly outline the distinctions between eminent domain and police power. These distinctions have an important bearing on this case, and particularly in view of this fundamental difference: a taking in eminent domain proceedings contemplates compensation; a destruction of property under the police power leaves the owner uncompensated. *Chicago, etc., R. Co. v. People,* 212 Ill. 103, 72 N.E. 219.

Noting that the owner is entitled to compensation in eminent domain proceedings, the Illinois Supreme Court in the last cited case continued:

" * * * While the police power is usually exerted merely to regulate the use and enjoyment of property by the owner, or, if he is deprived of his property outright, it *is not taken for public use,* but rather destroyed in order *to promote the general welfare of the public,* and in neither case is the owner entitled to any compensation for an injury which he may sustain in consequence thereof, for the law considers that either the injury is damnum absque injuria or the owner is sufficiently compensated by sharing in the general benefits

resulting from the exercise of the police power." (Emphasis supplied.)

The Urban Renewal Law and the project proposed to be undertaken thereunder in the present instance contemplate that a *predominance* of properties in the area fall within the definition of structures and improvements making slum or blighted areas; that a number of properties therein are unoffending; that some are approaching the degenerative state which eventually would bring the area nearer to being slum or blighted in character. "There's the rub."

Vindication for the Urban Renewal Law is expressly found in the police power. But police power cannot be exercised in respect of unoffending property. The measure of the right to exercise the police power is the right to regulate the use of property or to destroy it because either in the use or existence thereof it has a detrimental effect on the public health, safety, morals or general welfare. In this respect, properties must be considered individually. Individual properties which are not harmful to the public health, safety, morals or general welfare are not, and cannot be, the proper subjects of regulation or destruction in the exercise of the police power.

Lawful, harmless properties may not be destroyed under a police power measure because located in an area containing properties which may be so treated, or nestled between such properties as are or may be proper subjects for exerting the police power. What becomes of the natural, essential and inalienable right to acquire, possess and protect property if lawful, harmless buildings and improvements can be razed because so located? Lawful, harmless structures are the proper subjects of acquisition, possession and protection. To hold otherwise would render empty and meaningless declarations of rights in the Constitution which have been considered precious to and inherent in man.

There are other disturbing elements in this case which provoke comment in view of the right of persons, re-

gardless of their station in life, to acquire, possess and protect property inoffensive from the standpoint of health, safety, morals and welfare of the public. How are the great masses of the people to realize their aspirations of acquiring and possessing property, pursuing happiness, and enjoying life and liberty unless they are permitted to acquire and hold property, however humble in character? Are persons in extremely humble circumstances to be denied the opportunity to acquire and possess a home?

The effect of the Urban Renewal Law is to foreclose the purchase and possession of a home in certain areas which the administrative agency may deem to be potentially blighted or slum in character. And yet innate in every person is the urge to own and possess property — to have a home which he can call his own. This urge inheres in the man of meager means as well as in the well-to-do. May it not be said that so long as the public health, safety, morals or welfare are not endangered by the man who starts in humble beginnings, his right to own and possess property should not be thwarted? Is not this more in keeping with the tradition of this country?

And where do the persons of meager means in the area involved go if this project becomes reality? Probably they can do no better than seek the equivalent of that which they presently have. In all probability that means the removal to an area having the same characteristics as the one from which they are evicted. Continuing with probabilities, they would eventually face the same fate that will befall them in this case. An alternative would be to become renters, for it is not likely that they can afford homes of better quality. Thus, their constitutional right to acquire and possess property becomes a mirage — expressed in ghostly words with only a semblance of substance.

Compulsory mass migration accomplished in an aura of legality under circumstances here present should be

deprecated as being out of harmony with fundamental law. Such migration excites feelings of compassion, particularly since most people in this area probably are of a certain economic level and will by reason thereof seek the same level in removing from the present area, only to be the subjects of another compulsory mass migration as the area to which they move comes under the operation of the Urban Renewal Law.

Families and merchants are uprooted, notwithstanding some, and possibly a substantial number of them, own and possess structures presently inoffensive to the public health, safety, morals or welfare. Only in recognized greatly emergent situations should the government exercise such power, and this is not one of them.

Some of the lamentable pages of history relate to instances of forced mass transplantation of human beings. These events stir the sensibilities of mankind. That the removal of persons from their homes and business places in this case is not on so large a scale does not soften the effect.

The Urban Renewal Law does not bestow the first option to the persons divested of property in the area to gain it back. Nor does it provide that such persons shall have the privilege of being active participants in the land development to follow the taking of the property. Perhaps such a provision would fall afoul of the constitutional prohibitions that property shall not be taken for a private use and that relief in any form shall not be afforded persons for certain purposes. Art. V, Sec. 34. If such acts or purposes are vulnerable to attack in these respects, then surely the proposal before us is vulnerable to the same degree.

It is contended that a public use is accomplished by eliminating a blighted or slum condition, and that it is a matter of indifference in a constitutional sense what happens to the property thereafter. Bottomed in the exercise of the police power, resort is had to condemnation to raze structures and improvements, the majority

of which are said to be dangerous to the health, safety, morals and welfare of the public, but conceivably a substantial portion of which do not so offend. Because there may be more offensive than inoffensive structures in a selected area, even by a percentage point, the inoffensive must go with the bad.

Such is a circumvention of the proper exercise of the police power to which we may not be indifferent. Nor may we construe the eminent domain provision in such sense as to say it is a matter of indifference what happens to the property after the area is levelled. "Public use" is not an instrument for the exercise of the police power, nor does police power contemplate regulation or destruction of property for "public use"; to hold otherwise is dangerous doctrine. To so construe it is a garbling of terms and concepts which opens new vistas the ends of which may do untold harm.

What I once said warrants repeating. "There is a proneness to regard constitutions as instruments of boundless accommodation, taking on so many shapes as in truth to be shapeless, and all because of the seductive notion that constitutions are Protean. That their generalities make for living documents covering changes in a developing society, no one will deny; but there are 'no trespass' signs in these constitutions, effective against encroachment by the executive, legislative and judicial departments in certain areas, and among these areas are the natural rights of man enumerated in the Bill of Rights." *Vogts v. Guerrette,* 142 Colo. 527, 351 P. (2d) 851, dissenting opinion.

History is monotonously repetitive. History in essence is little more than a chronicle of the struggle for the recognition and preservation or the abridgment of certain rights. In recent years the fortunes of the struggle have swung toward abridgment. The Urban Renewal Law is another effort to curtail individual rights in disregard of constitutional protections. At least the strug-

gle should be in the forum of elections, to ascertain if the people desire to surrender these rights.

In addition to the foregoing, I join in the views expressed by MR. JUSTICE MOORE.