## No. 25799

Pillar Of Fire, a Colorado Non-Profit corporation v. Denver Urban Renewal Authority, a body corporate and politic of the State of Colorado, District Court in and for the City and County of Denver, Honorable John Brooks, Jr., and Honorable James C. Flanigan, Judges Assigned

(509 P.2d 1250)

Decided May 14, 1973. Rehearing denied June 4, 1973.

J. Fred Schneider, Thomas Quentin Benson, for petitioner.

Berge, Martin & Clark, for respondent Denver Urban Renewal Authority.

MR. JUSTICE ERICKSON delivered the opinion of the Court.

The Denver Urban Renewal Authority filed a petition to condemn Memorial Hall, the first permanent church building of the Pillar of Fire Church. In an original proceeding, the church seeks to prohibit the Renewal Authority and the District Court from proceeding further. We issued a rule to show cause and now discharge the rule and remand for proceedings consistent with the views expressed in this opinion.

We are faced with a possible confrontation between the state's power to carry out its urban renewal program and the protection afforded a religious institution by the First

Amendment of the United States Constitution and Article II, Section 4 of the Colorado Constitution. Urban renewal has become one of the vital concerns of government today. We upheld the constitutionality of Colorado's Urban Renewal Law in *Rabinoff v. District Court,* 145 Colo. 225, 360 P.2d 114 (1961). C.R.S. 1963, 139-62-1, *et seq.* Planned and well thought out redevelopment of our cities is essential to the future success and well-being of our country. Urban slums and blighted areas suffocate the spirit of the inhabitants in the cities and force them to leave to seek a more acceptable environment in which to live. Experts in redevelopment have concluded that large-scale overall planning is necessary to restore health to the cities and to prevent slums from expanding to enlarge the cycle of decay. *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

The Denver Urban Renewal Authority is engaged in a project of redevelopment in an area which covers approximately thirty-three blocks in downtown Denver which is known as the Skyline Urban Renewal Area. The Authority acquires property within the area and then sells it to private entrepreneurs who undertake and agree to develop the property in accordance with the Authority's overall redevelopment plan. Renovation of certain structures within the area has been allowed and has been incorporated into the general plan, but most of the buildings in the urban renewal area have been or will be demolished.

The planned development for the block upon which the church building stands includes construction of an office building which will cost twenty-five to thirty million dollars. The block will be offered for sale at a price of approximately $1,200,000. The Authority has indicated that unless the Pillar of Fire Church can underwrite such a development, its Memorial Hall will be condemned and demolished.

Memorial Hall was built in 1903-4, shortly after the founding of the Pillar of Fire Church, which was an evangelistic offshoot of Methodism. The church was first known as the Pentecostal Union. In 1917, the church adopted the name Pillar of Fire from the Book of Exodus.

The Pillar of Fire Church now maintains churches in eighteen states, as well as in several foreign countries. The church was first organized in Denver in 1901 by the evangelist Alma White. In its earliest days, the church held its meetings in tents, but as the church grew, Memorial Hall was constructed. Memorial Hall is still used for church purposes, although not for regular Sunday services. The petitioner contends that the brick building in issue is revered for its historical and symbolic meaning in the birth of the Pillar of Fire Church.

 The starting point for our analysis is the principle that the power of eminent domain is merely one method of exercising the power of government.

"Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is simply the means to the end." *Berman v. Parker, supra.*

The Court in *Berman* upheld the urban renewal statute of the District of Columbia. The Court recognized the need for urban renewal to restore health to our cities and the need for an integrated plan of redevelopment to effectively renew areas which have become slums and have blighted the use of the area. The Court rejected the argument that the renewal authority had to justify each boundary and each planning decision. Such decisions, it held, were for the other branches of government. The Court was, of course, applying the familiar doctrine that the judicial branch does not inquire into the wisdom of a legislative decision. Thus, the legislature is free to choose any method which is appropriate to reach a proper governmental end. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Our analysis, however, cannot end at this point, because the petitioner, Pillar of Fire, is challenging the Urban Renewal Authority's decision to condemn on the ground that the free exercise of religion is threatened and impaired by this condemnation proceeding. The court below took an absolute view of the First Amendment issue. At the end of the first hearing, the court held that unless the church was dilapidated, its property could not be condemned. Some time later, prior to a hearing

on a related equal protection issue, the court changed its position and held that the church's property could be condemned. No findings appear in the record to indicate that the competing interests of church and state were ever weighed to determine which should prevail.

■ We, of course, recognize the extraordinary importance of the rights and freedoms engraved in the foundation of our country by the First Amendment of the Bill of Rights. Of all freedoms, freedom of worship may be the most precious to the spirit. Moreover, we all recall that our country was founded in large part by men and women who emigrated from lands where their form of worship was persecuted. Authority need not be cited to prove that the right to free exercise of religion is still vital in today's constitutional law. The religious precepts of the Amish have just recently been secured by the Supreme Court's recognition of the right of Amish parents to rear their children in a way which is inconsistent with compulsory public education. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The state has few higher interests than the education of its future citizens, but the *Yoder* case holds that the right to religious freedom counterbalanced even that state concern. Our national legislature has recognized the importance of religious freedom in a series of conscientious objector statutes. Though the very life of the state may be at stake in the matter of national defense, men who sincerely object to war on the basis of religious training or belief are exempted from duty to serve in the armed forces. 50 U.S.C. App. § 456(j).

The history of accommodation between church and state in this country reveals no bright line to indicate when the power of the state should defer to religious freedom or the manner in which a religion is exercised. The United States Supreme Court has had to balance the admittedly strong competing interests in numerous cases, and sometimes the state has won, and sometimes the church. Bigamy, as part of the Mormon religion, was not exempt from secular prohibition. *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 25

L.Ed. 244 (1879). However, door-to-door proselytizing cannot be forbidden. *Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). No administrative officer can have the power to forbid solicitations for religious activities, but reasonable regulations of time, place, and manner are permissible. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Even religious activity does not justify using children as street solicitors in violation of a child labor law. *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

■ Prior to *Wisconsin v. Yoder,* supra, the leading case was *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The Court in *Sherbert* said that government action which burdens the exercise of religion can only be justified by some compelling state interest which cannot be accomplished by any reasonable alternative means. In *Sherbert,* the Court held that a person who was discharged because she refused to work on her Sabbath, which was Saturday, could not be denied unemployment compensation for that reason. The *Sherbert* decision indicates that the exercise of religion must be stoutly shielded, but that in any particular case the conflicting interests must be weighed. A suitable state interest justifying a burden on religious freedom was found in *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), when the Court denied conscientious objector status to those who opposed the war in Vietnam on religious grounds, while not objecting to war in general. Also, shortly before the decision in *Sherbert v. Verner, supra,* Sunday closing laws were upheld as a proper exercise of state power, even though some incidental burden was placed on Saturday Sabbatarians. *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

Lower courts have faced challenges to governmental power on religious grounds and similarly have left a blurred line between church and state. *E.G., Spence v. Bailey,* 465 F.2d 797 (6th Cir. 1972) (high school student exempted from

ROTC requirement); *In re Jenison,* 267 Minn. 136, 125 N.W.2d 588 (1963) (juror excused because of religious scruples, on remand from USSC); *People v. Woody,* 61 Cal.2d 716, 40 Cal. Rptr. 69, 394 P.2d 813 (1964) (peyote use by Native American Church exempted from drug prohibition); *United States v. Kuch,* 288 F.Supp. 439 (D.D.C. 1968) (no exemption for use of marijuana and LSD by Neo-American Church).

The only conclusion which we can draw is that we must balance the interests involved in the controversy before us and recognize that the state must show a substantial interest without a reasonable alternate means of accomplishment if the state is to be constitutionally allowed to take the birthplace of the Pillar of Fire Church, which is alleged to be *sui generis.*

In our judgment, urban renewal is a substantial state interest that can justify taking property dedicated to religious uses. The harder question which must also be decided is whether the courts should review the decisions and plans of the Renewal Authority. In *Berman, supra,* Justice Douglas, speaking for the Court, said that the particular decisions of the renewal authority were properly for the legislative and administrative branches and not for the court to review, but no First Amendment rights were at issue in the case. We do not think that the judicial branch can avoid its responsibility to guard constitutional rights by leaving the protection of First Amendment freedoms to the other branches without a right of review.

The courts have honored their responsibility in the past. In *Sherbert v. Verner, supra,* only a handful of people were directly affected by the decision of the employment authorities; in *Wisconsin v. Yoder, supra,* only a few hundred school children were involved. The Pillar of Fire is not an organization of hundreds of thousands and is not able to muster widespread political support. This church, then, must turn to the courts as the guardians of the rights guaranteed by the First Amendment. We recognize, however, that if courts were to review every acquisition of land by the Renewal Authori-

ty, any hope of efficient execution of an overall, integrated plan would vanish. *Berman v. Parker, supra.* We do not think that such a fear justifies denying to the Pillar of Fire a chance to defend its birthplace. Not only is the building in question being used for religious purposes, but the building and the site are alleged to have unique religious significance for the Pillar of Fire. The loss of the Pillar of Fire would allegedly go far beyond the incidental burden of having to move to a new location which would occur if any church building were condemned.

We must recognize that this case presents an issue which has rarely, if ever, been squarely raised before. In our research, we have found very few cases dealing with condemnation of religious property. We believe that direct confrontations of the sort in this case have been avoided because legislatures and administrative bodies have generally accorded great respect to religious organizations.

The Pillar of Fire is entitled to a hearing at which the competing interests of the Renewal Authority and the church can be weighed. A court must be given an opportunity to judge whether the Authority's plans for the specific block and the site of the church are so vital to the overall renewal plan that the petitioner's property should be condemned and demolished. The First Amendment protects freedom of religion which has its roots in the hearts and souls of the congregation, not in inanimate bricks and mortar. Yet, religious faith and tradition can invest certain structures and land sites with significance which deserves First Amendment protection. We recognize that church property is private property which can be taken by eminent domain for paramount public use, *Beth Hagodol v. Aurora,* 126 Colo. 267, 248 P.2d 732 (1952), just as religious conduct is subject to appropriate regulations for the public good. *See Mack v. Highway Commission,* 152 Colo. 300, 381 P.2d 987 (1963); *Welch v. Denver,* 141 Colo. 587, 349 P.2d 352 (1960); *Macon & A. Ry. Co. v. Riggs,* 87 Ga. 158, 13 S.E. 312 (1891).

When regulating religious conduct, however, the

state may be challenged to justify its infringement of the totally free exercise of religion. *E.g., Cantwell v. Connecticut, supra.* We hold that under these circumstances, the state may be so challenged to justify a use of its power of eminent domain. The District Court must weigh the plans and goals of the Renewal Authority, as they bear on the particular land in question, against the right of the Pillar of Fire Church to maintain a brick structure which the Church claims is unique and does not conform to the general plan for development of the block or the area. The petitioner's claim that the *sui generis* nature of the mother church of the Pillar of Fire prohibits condemnation causes us to apply a balancing test in considering the rights of the parties to this action. In the past, we have indicated our disapproval of blanket decisions that deny a church an opportunity to have its rights considered. *City of Englewood v. Apostolic Christian Church,* 146 Colo. 374, 362 P.2d 172 (1961) (a blanket prohibition of churches from single and double family residence zones was held improper).

 We cannot uphold an unreviewed general decision by the Renewal Authority which will destroy the first church which was erected by the members of the Pillar of Fire Church. The petitioner is entitled to its day in court to determine which of the rights should prevail. On remand, the trial court need not conduct further hearings on the equal protection argument that the Pillar of Fire raised. A full hearing was held on the equal protection issue and was properly resolved against the Pillar of Fire. *Rabinoff v. District Court, supra. See also, Ellis v. City of Grand Rapids,* 257 F. Supp. 564 (W.D. Mich. 1966); *Colchico v. United States,* 286 F. Supp. 507 (N.D. Cal. 1968).

The cause is remanded for proceedings consistent with this opinion.

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE DAY do not participate.