**THORNTON DEVELOPMENT AUTHORITY, Petitioner,**

v.

**Richard F. UPAH, Trustee; Richard F. Upah; and Helen Hill, as Treasurer of Adams County, Colorado, Respondents.**

Civ. A. No. 85–K–2124.

United States District Court, D. Colorado.

July 31, 1986.

Marlin D. Opperman, William M. Schell, Opperman & Associates, P.C., Denver, Colo., for petitioner.

David J. Richman, John M. Richilano, Coghill & Goodspeed, P.C., Denver, Colo., for respondents.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

Petitioner Thornton Development Authority is an urban renewal authority established pursuant to Colo.Rev.Stat. §§ 31–25–101 *et seq.* TDA brought this condemnation proceeding against respondent Richard Upah pursuant to the eminent domain procedures set forth in Colo.Rev.Stat. §§ 38–1–101 *et seq.*

The only issue to be presented at a condemnation trial is what price the petitioner must pay for the land sought to be acquired. All other matters are decided in advance of trial by the court. *See* Colo. Rev.Stat. § 38–1–101; *Kaschke v. Camfield*, 46 Colo. 60, 63–64, 102 P. 1061 (1909). The property owner is entitled to controvert the petitioner's right to condemn, and when he does, the burden is on the petitioner to maintain his right to condemn by proper proof. *Kashke*, 46 Colo. 60, 64, 102 P. 1061.

In the instant case, Upah filed a motion to dismiss raising several issues regarding jurisdiction and the regularity of the condemnation proceedings. Briefly, Upah asserts this action must be dismissed because: 1) TDA failed to comply with certain statutory requirements and, thus, TDA lacks the power to condemn his land; 2) this taking is for a purely private, and, therefore, improper purpose; and 3) this taking violates his constitutional rights. These issues are preliminary in nature and must be resolved before trial.

Specifically, Upah argues TDA's petition in condemnation must be dismissed for the following reasons:

1. Jurisdiction is lacking because TDA failed to negotiate for purchase of Upah's land in good faith;

2. TDA's attempted exercise of eminent domain is not necessary for the public health, safety, and welfare;

3. TDA intends to use improperly its power of eminent domain for a private, rather than public, purpose in violation of Upah's rights under Colo. Const., Art. II., § 14;

4. TDA's attempted exercise of eminent domain is an arbitrary and capricious exercise of its power since the petition is based on an improper and unfounded determination of "blight" within the meaning of Colo.Rev.Stat. § 31–25–103(2);

5. TDA failed to comply with Colo.Rev. Stat. § 31–25–107(6) which deals with the development of open land by an urban renewal authority;

6. TDA failed in its obligation under Colo.Rev.Stat. § 31–25–106(2) to submit the issue of development of the subject property to competitive bidding;

7. TDA failed to provide Upah with adequate notice and an opportunity to be heard, thereby depriving him of due process as required by the Fourteenth Amendment and Colo. Const., Art. II, § 25;

8. TDA's attempted exercise of eminent domain violates Upah's rights under Colo.Const., Art. II, § 15 and the Fourteenth Amendment.

1. *Jurisdictional Prerequisite of Failure to Agree on Price*

Colo.Rev.Stat. § 38–1–102(1) states that a petition for condemnation may be filed [i]n all cases where the right to take private property for public or private use without the owner's consent ... is conferred by general laws or special charter upon any ... municipal authority ... and

the compensation to be paid for, in respect of property sought to be appropriated or damaged for the purposes mentioned, cannot be agreed upon by the parties interested. . . .

The question whether the parties failed to agree upon compensation is jurisdictional in nature. *City of Thornton v. Farmers Reservoir & Irrig. Co.*, 194 Colo. 526, 575 P.2d 382, 392 (1978); *Kaschke*, 46 Colo. 60, 64, 102 P. 1061. The burden of proof is on the petitioner in a condemnation proceeding to establish there was a failure to agree upon the compensation, after negotiations, to be paid for the property. *Stalford v. Board of County Commissioners*, 128 Colo. 441, 447, 263 P.2d 436 (1953). Generally, the petitioner must show

that the condemning authority ma[d]e a reasonable good faith offer to reach an agreement with the owner of the property for its purchase. Lengthy or face-to-face negotiations are not required. The making of a reasonable offer to purchase in good faith by [for example] letter and allowing the property owner time to respond is sufficient. If the property owner remains silent or rejects the offer without making an acceptable counter-offer, a condemnation action may be instituted.

*City of Thornton*, 575 P.2d 382, 392 (citing *Interstate Trust Bldg. Co. v. Denver Urban Renewal Authority*, 172 Colo. 427, 473 P.2d 978 (1970)); *see also Board of County Commissioners v. Blecha*, 697 P.2d 416, 417 (Colo.App.1985) (to satisfy this jurisdictional prerequisite, the condemning authority must show that it made a reasonable good faith offer to reach agreement on the price with the property owner).

In *City of Thornton*, the petitioner sent a letter to the organization representing the property owners offering to purchase the property for a certain amount and requesting a response within two weeks. The property owners never responded. The condemnation proceeding was filed six weeks after the letter had been sent. Two years later, the petitioner sent letters to the individual property owners offering to purchase their interest in the property. Only three out of 270 shareholders responded. The trial court found the failure-to-agree prerequisite had been met. The Colorado Supreme Court upheld this determination. *City of Thornton*, 575 P.2d 382, 392.

In *Interstate*, the Colorado Supreme Court stated:

The argument that there was no showing of good faith negotiation prior to the institution of the condemnation proceedings is not borne out by the record. DURA made an initial offer to Interstate for the property here in question of $197,500 and later raised that offer. Interstate eventually rejected these offers and by its actions declined DURA's invitation "to get together and negotiate." The fact that at the hearing for immediate possession DURA's appraiser testified that the market value of the property as of the date of the hearing was $215,000 does not mean that DURA had previously failed to negotiate on a good-faith basis. It takes more than one to negotiate and from the record before us it would certainly appear that Interstate was never in the negotiating mood.

*Interstate*, 473 P.2d 978, 981.

In *Blecha*, the petitioner made an offer in writing to the property owner to which no reply was made. Thereafter, the petition in condemnation was filed. The Colorado Court of Appeals held, under these circumstances, the petitioner negotiated in good faith. *Blecha*, 697 P.2d 416, 418.

Finally, in *Board of County Commissioners v. Auslaender*, 710 P.2d 1180 (Colo. App.1985), the petitioner sent a letter to the property owner on June 29, 1983 offering to buy the owner's land. Five days later, the county attorney filed the condemnation action. On August 18, 1983, the county commissioners ratified the bringing of the action. Thereafter, the property owner filed a motion to dismiss, arguing the county failed to pursue good faith negotiations. The motion to dismiss was granted. The property owner then moved for attorney fees. The trial court denied

this request, finding that bringing the action was not frivolous.

On appeal, the Colorado Court of Appeals reversed the denial of attorney fees stating:

> The County's argument, presented at the hearing on the motion to dismiss, was that good faith negotiations prior to institution of an eminent domain action are not required if such negotiations would be futile. Under different circumstances, such an argument might have had a reasonable basis. However, here, a condemnation action was initiated only a few days after an offer was mailed and only five days after the County stated its intent to initiate good faith negotiations. Thus, the County's assertion concerning the futility of negotiations is not factually sustainable since no reasonable time for negotiations was provided.

*Auslaender*, 710 P.2d 1180, 1182.

■ The Colorado courts have made the waters murky in this area by failing to distinguish between failure to agree and good faith negotiations. The statute only requires a failure to agree but the courts seem to have implied a duty on the condemning authority to negotiate on a good faith basis. The Colorado cases are also not too helpful in that, in each case, the property owner failed to respond to the condemning authority's initial offer of purchase. I think, however, that the Colorado standard is whether the petitioner made a "reasonable effort to agree upon the compensation to be paid...." *Kaschke*, 46 Colo. 60, 65, 102 P. 1061. This standard gives substance to the requirement of failure to agree and it includes a minimal notion of good faith negotiations.

In the instant case, it is undisputed that TDA established an offering price of $592,500 for Upah's land. Paul Benedetti, TDA's special counsel, was appointed by TDA as its negotiator. On July 19, 1985,

Benedetti made this offer to Upah. On August 1, 1985, Upah's attorney responded that Upah was seeking $1,000,000 for the land. Benedetti presented this counteroffer to TDA for its review. It was not willing to pay this amount and did not make a counteroffer. On August 19, 1985, Benedetti filed this condemnation action on behalf of TDA against Upah.

■ Upah contends these facts demonstrate that TDA did not negotiate in good faith and, thus, the jurisdictional prerequisite of failure to agree has not been met. TDA, on the other hand, draws a distinction between failure to agree and negotiating in good faith, arguing the latter is not required under Colorado law. TDA argues further that rejection of its offer by Upah's counteroffer was sufficient to meet the jurisdictional prerequisite. Finally, TDA asserts it was futile to continue negotiating with Upah. *See Auslaender, supra.* I find that the actions of Benedetti when combined with the numerous telephone conversations he held with Upah and his representatives and the correspondence between Upah and the mayor of Thornton suffice to establish that the petitioner made a reasonable effort to agree upon the compensation to be paid. I hold that the parties failed to agree upon compensation before this action was commenced. Thus, the jurisdictional prerequisite has been met.

## 2. *Necessity and Public Purpose*

Next, Upah contends the taking is not necessary for the public health, welfare, and safety.[1] He also maintains the taking is for a private, rather than a public, purpose. Unfortunately, although these purported irregularities are set out separately, Upah has lumped them together. In essence, Upah is trying to assert the taking is not necessary since it is not for a public purpose.

---

1. Upah's use of the language "for the public health, welfare, and safety" suggests he may also be confusing the issue of necessity for taking with the issue of blight determination. Colo.Rev.Stat. § 31–25–104(1)(b) states that if the condemning authority finds the area to be a slum or blighted and that redevelopment "is necessary in the interest of public health, safety, morals, or welfare of the residents," it may exercise its powers of eminent domain. The issue of blight will be discussed later.

 Similarly, the Colorado courts have not done a very good job in maintaining the distinction between the issues of necessity and public purpose. *See e.g., Haver v. Matonock*, 75 Colo. 301, 304, 225 P. 834 (1924) ("The question of necessity simply involves the necessity of having the property sought to be taken for the purpose intended."). This is understandable, however, since the issues of necessity and public purpose are closely related and, to some extent, interconnected.

Basically, necessity involves the selection of the location of the property to be acquired and the quantity of the land required. *See Union Pacific R.R. Co. v. Colorado Postal Telegraph-Cable Co.*, 30 Colo. 133, 138, 69 P. 564 (1902). "The determination of necessity [by the condemning authority] is an essential part of the power of eminent domain. Once necessity is determined by legislative act, no further finding or adjudication is required." *City of Thornton*, 575 P.2d 382, 389 (citing *Londoner v. Denver*, 52 Colo. 15, 119 P. 156 (1911)). In other words, the condemning authority's determination of necessity is "not reviewable by the judiciary absent a showing of fraud or bad faith." *City of Thornton*, 575 P.2d 382, 389 (citing *Colorado State Board of Land Commissioners v. District Court*, 163 Colo. 338, 430 P.2d 617 (1967); *Dallasta v. Department of Highways*, 153 Colo. 519, 387 P.2d 25 (1963); *Mack v. Highway Commission*, 152 Colo. 300, 381 P.2d 987 (1963); *Denver v. Board of Commissioners*, 113 Colo. 150, 156 P.2d 101 (1945); and *LaVelle v. Town of Julesburg*, 49 Colo. 290, 112 P. 774 (1911)); *see also Welch v. City and County of Denver*, 141 Colo. 587, 590, 349 P.2d 352 (1960) ("[I]n the absence of a showing of bad faith on the part of the agency acquiring property ..., the determination of the administrative body as to the necessity for the particular acquisition will not be disturbed by the courts.").

In the instant case, Upah cites numerous examples of TDA's alleged intent to acquire Upah's land for a private developer and, thus, for a private purpose. Upah goes on to cite the lack of public purpose as establishing the lack of necessity. Upah makes no argument that too much land is being sought or that the location is improper. However, even with this issue of bad faith, TDA bears the burden of proof to show the taking is necessary.

Regarding public purpose, two Colorado constitutional provisions are operative. Section 14 of Article II provides:

Private property shall not be taken for private use unless by consent of the owner except for private ways of necessity, and except for reservoirs, drains, flumes or ditches on or across the lands of others, for agricultural, mining, milling, domestic or sanitary purposes.

Section 15 of Article II provides:

Private property shall not be taken or damaged, for public or private use, without just compensation. Such compensation shall be ascertained by a board of commissioners, of not less than three freeholders, or by a jury, when required by the owner of the property, in such manner as may be prescribed by law, and until the same shall be paid to the owner, or into court for the owner, the property shall not be needlessly disturbed, or the proprietary rights of the owner therein divested; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public.

Unlike the question of necessity, deference is not given to the condemning authority's finding of a public purpose and no showing of bad faith is necessary with respect to this issue. The court determines whether the purpose for the taking is public or private. *See Larson v. Chase Pipe Line Co.*, 183 Colo. 76, 514 P.2d 1316 (1973) (Judicial approval of the purpose for the taking of property as a public use is required).

 There is no formula for determining whether the purpose for the taking is pub-

lic. *Buck v. District Court*, 199 Colo. 344, 608 P.2d 350, 351 (1980). Generally, however, there are two uses which may be deemed public. The first is public employment or actual use by the public. The second is public advantage or benefit. In the instant case, the subject land is not sought for actual use by the public in the ordinary sense (like a park or street). Rather, TDA seeks to condemn the land as a "blighted" area for redevelopment as a shopping center. Thus, this case falls within the second category of uses.

Under the Colorado Urban Renewal Statutes, the condemning authority may seek to condemn land which is in a "blighted" or "slum" condition. It is beyond cavil that condemnation of such land for redevelopment constitutes a public purpose. Upah asserts, however, that his land is not blighted and that the taking of the land is intended for a purely private use. Upah recognizes that the involvement of private enterprise in an urban renewal project does not necessarily rob the project of its public purpose. Further, Upah acknowledges that the eventual private ownership of land has been found to be incidental to the chief goal of eliminating blight in the urban renewal project area and, under the proper circumstances, does not offend the public purpose requirement. Upah contends, however,

> it is not involvement of Thornton Associates that is incidental to the condemnation of ... [the] land; rather it is the involvement of the TDA that has become incidental! The facts clearly establish that the shopping center project is the brain child of Mr. Elken and the private enterprise which he represents, Thornton Associates. The TDA did not decide to redevelop the Valley View Subdivision with a specific urban renewal project, and then go out and find a private developer who would carry out the project. Rather, the facts here clearly demonstrate, the private developer was unable to carry out his private goal, so he sought out the city to "assist" him.

Upah's Brief in Support of Motion for Summary Judgment at 40–41 and Post-Hearing Brief.

TDA responds by citing *Rabinoff v. District Court*, 145 Colo. 225, 360 P.2d 114 (1961) and *Tracy v. City of Boulder*, 635 P.2d 907 (Colo.App.1981). In those cases, the courts held that eventual private ownership does not render the taking unconstitutional. In *Rabinoff*, the Denver Urban Renewal Authority sought to condemn several properties and thereafter sell a substantial part of these properties to private enterprises for the purpose of redevelopment. The Colorado Supreme Court found this proper:

> The General Assembly has selected a method whereby the object shall be accomplished not by public ownership of the land but rather through private endeavor and ownership under the direction of authorized officials. The acquisition and transfer to private parties is a mere incident of the chief purpose of the act which is rehabilitation of the area.

*Rabinoff*, 360 P.2d 114, 119.

Upah attempts to distinguish this case by asserting that the primary, rather than incidental, purpose of the taking in this case is to transfer the land to Thornton Associates. Also, Upah states *Rabinoff* is distinguishable because the city sought to sell the land to private enterprises after redevelopment. This particular argument is without merit. In *Rabinoff*, the city wished to sell the land for private development. 360 P.2d 114, 116.

### 3. *Determination of Blight*

Next, Upah asserts TDA's attempted exercise of the power of eminent domain is arbitrary and capricious since the petition is based on an improper and unfounded determination of "blight" within the meaning of Colo.Rev.Stat. § 31–25–103(2). That subsection provides:

> "Blighted area" means an area which, by reason of the presence of a substantial number of slum, deteriorated, or deteriorating structures, predominance of defective or inadequate street layout, faulty

lot layout in relation to size, adequacy, accessibility, or usefulness, unsanitary or unsafe conditions, deterioration of site or other improvements, unusual topography, defective or unusual conditions of title rendering the title nonmarketable, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs or arrests the sound growth of the municipality, retards the provision of housing accommodations or constitutes an economic or social liability, and is a menace to the public health, safety, morals, or welfare in its present condition and use.

According to the Colorado Court of Appeals, this definition "is broad and encompasses not only those areas containing properties so dilapidated as to justify condemnation as nuisances, but also envisions the prevention of deterioration." *Tracy,* 635 P.2d 907, 909. Unlike the public purpose requirement, the condemning authority's

> determination as to whether an area is blighted, when such determination relates to the need for an ordinance, is a legislative question and the scope of review by the judiciary is restricted. *United States Disposal Systems, Inc. v. City of Northglenn,* 193 Colo. 277, 567 P.2d 365 (1977); *McCray v. City of Boulder,* 165 Colo. 383, 439 P.2d 350 (1968). The appropriate issue is whether the municipality has acted within its statutory authority in exercising its legislative functions. The court's task is to exercise an independent determination to insure that the Council's decisions are based on evidence presented at Council hearings, that the ordinance is supported by fact findings, and that the Council applied the legislative standards set out in the urban renewal plan. *See Public Utilities Commission v. Northwest Water Corp.,* 168 Colo. 154, 451 P.2d 266 (1969).

*Tracy,* 635 P.2d 907, 909.

Under Colo.Rev.Stat. § 31–25–107, an urban renewal authority cannot actually undertake an urban renewal project until the governing body, by resolution, has determined that the area to be condemned is a slum or blighted area. The steps which must be taken before this determination is made are as follows:

1. The governing body must submit the urban renewal plan to the planning commission of the municipality for review and recommendations. § 31–25–107(2).

2. The planning commission must submit any written recommendations to the governing body within thirty days. *Id.*

3. Upon receipt of the recommendations or after the thirty days expires, the governing body may proceed with a hearing on the proposed urban renewal plan. *Id.*

4. The hearing shall be public and can be held only after public notice is given in a newspaper of general circulation. § 31–25–107(3).

5. After the hearing, the governing body may approve the plan if it finds, among other things, that "[t]he urban renewal plan will afford maximum opportunity, consistent with the sound needs of the municipality as a whole, for the rehabilitation of the urban renewal area by private enterprise." § 31–25–107(4)(c).

6. If the urban renewal area consists of open land which, under the plan, is to be developed for nonresidential uses, the governing body must also determine that such nonresidential uses are necessary and appropriate to facilitate the proper growth and development of the community. § 31–25–107(6).

In the instant case, Upah asserts the city council formed TDA in September, 1981. TDA adopted an urban renewal plan in August, 1982. The city council formally adopted the plan in September, 1982. This plan did not contain any provisions authorizing TDA to acquire land by condemnation or otherwise. The defined urban renewal area consisted of land bound by 84th Avenue, 104th Avenue, Washington Street, and Huron Street. Although much of this land was vacant, the city council did not make any findings required as to open

land. Also, the city council made no determinations of blight at that time.

In June, 1984, Upah contends Elken approached TDA, seeking condemnation of Upah's land. TDA "agreed" to modify the urban renewal plan to include powers of condemnation. In September, 1984, the amendment was formally presented to the city council. This amendment did not generally vest the power of eminent domain in TDA. Rather, it expressly granted such power only with respect to lots which Elken had been unable to acquire, including Upah's property.

Upah asserts the council never made any determination of blight with respect to his land. Although the original resolution adopting the urban renewal plan recites a finding of blight, Upah contends there is no evidence that this finding was based on evidence adduced at a public hearing, that the recital is supported by factual findings, or that it is based upon the legislative standards for determining blight.

■ The evidence discloses the contrary. Exhibit A–10, a blight study, was presented to the council on July 26, 1982. After review by the city's commission, the city council passed an ordinance on September 13, 1982 approving the Urban Renewal Plan. Whether city employees or council members determined facts before the taking of evidence at the formal council hearing is not relevant. The council's decision was based on evidence presented at council hearings.

### 4. Development of Open Land

As mentioned above, Upah also contends TDA lacks the authority to condemn his land because the city council failed to make an "open land" determination. Where open land, such as Upah's is involved, the city council must consider and find that the proposed nonresidential uses are necessary and appropriate to facilitate proper growth and development of the community. Upah asserts the council's failure to make such a finding voids the taking by TDA because, where a public authority undertakes an urban renewal project which contemplates involuntary land acquisition, "scrupulous adherence to legal requirements" is mandated. *Rabinoff,* 360 P.2d 114, 122.

TDA, on the other hand, argues this determination need only be made where all or a substantial part of the land is vacant. The parties have stipulated that 42.5% of the plan area is vacant. Accordingly, TDA alleges the area does not "consist" of open land.

Upah responds that the language of the statute is plain and the legislature did not choose adverbs such as "predominantly" or "wholly" to modify "consists of". Thus, Upah contends the city council was required to make the "open land" determination, especially since all of the land sought to be condemned was open or vacant.

■ The language of the statute, § 31–25–107(6) is controlling. It is not ambiguous. It states, "... in case the urban renewal area consists of an area of open land ... the local governing body shall comply with the applicable provisions of this section ..." (emphasis added). The urban renewal area in this case does not consist of an area of open land. It consists of patches and parcels of improved land, developed land and some open land. The statute does not apply.

### 5. Competitive Bidding Requirements

Next, Upah asserts this action must be dismissed because TDA failed to comply with the competitive bidding requirements of Colo.Rev.Stat. § 31–25–106(2). That subsection provides:

An authority may dispose of real property in an urban renewal area to private persons only under such reasonable competitive bidding procedures as it shall prescribe or as provided in this subsection (2). An authority, by public notice by publication once each week for two consecutive weeks in a newspaper having a general circulation in the municipality, prior to the execution of any contract to sell, lease, or otherwise transfer real property and prior to the delivery of any instrument of conveyance with respect

thereto under the provisions of this section, may invite proposals from and make available all pertinent information to any person interested in undertaking to redevelop or rehabilitate an urban renewal area or any part thereof. Such notice shall identify the area, or portion thereof, and shall state that such further information as is available may be obtained at the office designated in the notice. The authority shall consider all such redevelopment or rehabilitation proposals and the financial and legal ability of the persons making such proposals to carry them out and may negotiate with any persons for proposals for the purchase, lease, or other transfer of any real property acquired by the authority in the urban renewal area. The authority may accept such proposal as it deems to be in the public interest and in furtherance of the purposes of this part 1; except that a notification of intention to accept such proposal shall be filed with the governing body not less than fifteen days prior to any such acceptance. Thereafter, the authority may execute such contract in accordance with the provisions of subsection (1) of this section and deliver deeds, leases, and other instruments and take all steps necessary to effectuate such contract.

Upah maintains Elken and TDA conspired to get around the requirement of competitive bidding by structuring the bid requirements to include a "unified commercial project" which effectively eliminated any bidders other than Thornton Associates. This "unified commercial project" requirement mandated that the land be redeveloped in combination with the surrounding property which was owned by Thornton Associates. Upah also states: "That the project description eliminated any bidder other than Thornton Associates is not surprising, since Thornton Associates actually participated in and reviewed the drafts of the request for bids prior to its issuance." Upah's Brief in Support of Motion for Summary Judgment at 23. Because this bidding procedure did not adhere to the stat-

ute, Upah asserts the condemnation action should be dismissed.

■ TDA responds by arguing, first, that Upah's attack on the bidding procedure is collateral to the issues which comprise an eminent domain action. "It is axiomatic that matters which could not be raised in the original condemnation proceedings cannot be asserted in a collateral suit." *Ambrosio v. Baker Metropolitan Water & Sanitation District*, 139 Colo. 437, 438, 340 P.2d 872 (1959). Similarly, collateral issues cannot be raised in the condemnation proceedings. In the instant case, however, there is no authority for the proposition that the bidding issue is collateral. Upah asserts the bidding requirements were not adhered to and this is an issue which is arguably a matter to be decided *in limine.*

■ "Where the statute prescribes the conditions upon which, and the particular manner in which, the power should be exercised, the court necessarily is vested with power to determine whether there has been a compliance with the statutory requirements." 27 Am.Jur.2d, *Eminent Domain* § 401 at 280 (footnote omitted). In the instant case, § 31–25–106(2) provides that the condemning authority may not transfer property to private persons except under the bidding procedures it prescribes or those set out in that subsection. This statute affects matters after condemnation and is collateral. There is no Colorado law on this question. I am reluctant to formulate a rule of law in the present circumstances. Upah did not submit a competitive bid to the TDA. He did not show any damages suffered by reason of the bidding process used by the TDA. Further, Thornton did not follow the statutory bidding process with exactitude nor did it prescribe its own in advance of the process used. The statute is incomplete. The testimony of Benedetti establishes that custom and usage permits urban renewal authority to negotiate with a developer before the actual competitive bidding process begins. For reasons of standing and ripeness, I hold that

respondent's motion to dismiss on this point is denied.

### 6. *Notice and Opportunity to Be Heard*

Next, Upah contends TDA continuously failed to provide him with adequate notice and an opportunity to be heard, thereby depriving him of due process as required by the Fourteenth Amendment and Colo. Const., Art. II, § 25. A notice was published in the *Thornton Sentinel* pursuant to state statutes and Carpenter sent written notice to Upah, who is an out of state resident, four days before the hearing. Upah contends this was inadequate and he did not have sufficient opportunity to prepare for the hearing.

TDA on the other hand, argues Upah had actual notice of the proposed urban renewal plan amendment and the hearing. Also, Upah's attorney actually appeared before the city council and objected to the proposed land acquisition. Thus, Upah was provided due process.

### 7. *Other Violations of Constitutional Rights*

Finally, Upah asserts the proposed taking would violate his rights under the Colorado and federal constitutions in that his property is being taken for a private purpose. This issue of purpose has already been discussed. I have considerable sympathy for Mr. Upah's position. He owns property. He finds it being taken from him. From his coign of vantage it appears to be taken for a singularly private purpose. Likewise, he feels strongly that the City of Thornton, its agents and the TDA have interfered with his purely private business negotiations. Of course, he is right to a degree. Property, however, is not absolute. Condemnation for urban renewal purpose is a constitutional limitation on the exercise of property rights. Given its statutory authority, the Thornton Development Authority may engage in activity which results in advantage to one entrepreneur and disadvantage to another so long as a statutorily recognized public purpose is the stated basis for its action. In this case such public purposes as increasing revenues, sales, commerce and employment cannot be gainsaid. The wisdom of decisions made in effectuating such purposes is not a matter given to the courts in our system to consider.

Accordingly, IT IS ORDERED that the respondent's motion to dismiss is denied.

IT IS FURTHER ORDERED that the Thornton Development Authority is granted immediate possession of the subject property upon deposit into the registry of the court of $655,300. Withdrawal of part of this amount may be made by respondents in accordance with C.R.S. 38–1–105(6)(b).