The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
June 14, 2018

## 2018COA87

### No. 17CA0595, *City of Lafayette v. Town of Erie* — Municipal Law; Eminent Domain — Public Use or Purpose — Necessity — Bad Faith

A division of the court of appeals considers whether a
municipality may condemn a parcel of land belonging to a statutory
town for the purpose of creating an open space community buffer.
The division also considers whether the municipality's finding of
necessity and public purpose can be reviewed based on a showing
of bad faith.

Following the supreme court's decision in *Town of Telluride v.
San Miguel Valley Corp.*, 185 P.3d 161 (Colo. 2008), the division
concludes that a municipality may condemn a statutory town's
property because an open space community buffer would be a valid
public purpose.

However, the division concludes that (1) the district court's finding of bad faith behind the municipality's decision to condemn the property was correct; and (2) the municipality's finding of necessity can be reviewed.  The division holds that the municipality's ultimate reason for condemning the property — to prevent a grocery store and its associated tax revenue from relocating — is not a valid public purpose.

Accordingly, the division affirms the judgment.

COLORADO COURT OF APPEALS      **2018COA87**

Court of Appeals No. 17CA0595
Boulder County District Court No. 16CV30791
Honorable Norma A. Sierra, Judge

City of Lafayette, a home rule municipality and a Colorado municipal
corporation,

Plaintiff-Appellant,

v.

Town of Erie Urban Renewal Authority; and Town of Erie, Colorado

Defendants-Appellees.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE FOX
Ashby, J., concurs
Furman, J., specially concurs

Announced June 14, 2018

Hamre, Rodriguez, Ostrander & Dingess, P.C., Donald M. Ostrander, Richard
F. Rodriguez, Stephanie Ceccato, Denver, Colorado; Williamson and Hayashi,
LLC, David Williamson, Boulder, Colorado, for Plaintiff-Appellant

Waas Campbell Rivera Johnson & Velasquez LLP, Darrell G. Waas, Mikaela V.
Rivera, Denver, Colorado, for Defendants-Appellees

¶ 1     This dispute stems from the attempt by the City of Lafayette (Lafayette) to condemn a parcel of land owned by the Town of Erie (Erie). Lafayette appeals the district court's order granting Erie's motion to dismiss for lack of jurisdiction. Because the record supports the district court's finding that Lafayette had an unlawful motive for the condemnation, we affirm.

## I.     Background and Procedural History

¶ 2     Lafayette, a home rule municipality, and Erie, a statutory town, were signatories to the East Central Inter-Governmental Agreement (IGA), a comprehensive plan that sought to maintain some rural development as community buffers. The agreement lasted from 1994 to 2014. Lafayette and Erie were also signatories to the Super IGA — a comprehensive development plan for Boulder County. Erie and Lafayette withdrew from the Super IGA in July 2013.

¶ 3     After the two IGAs ended and the land along Highway 287 was no longer designated for rural preservation, commercial development by Erie and Lafayette ensued along Highway 287. The map below shows the relevant corridor of Highway 287. The Tebo property is part of unincorporated Boulder County. Lafayette

annexed Weems, a residential community.  The Safeway above Nine

Mile Corner — the property at issue — is in Erie.  Beacon Hill,

located below Nine Mile Corner, is residential property within

Lafayette.



¶ 4        Erie formed the Town of Erie Urban Renewal Authority

(TOEURA) in 2011.  In 2012, TOEURA purchased the Nelson

property and the Kuhl property — together, they form Nine Mile

Corner.  Erie annexed Nine Mile Corner from TOEURA in 2015.[1]

¶ 5        In 2013, Erie commissioned a geotechnical investigation of the

property which determined that the property was suitable for

development.  Two blight studies commissioned by Erie, in 2012

and 2015, found that Nine Mile Corner was a blighted area.  Erie

then began to develop an urban renewal plan for the property.  Erie,

TOEURA, and the Nine Mile Developer signed a disposition and

development agreement on March 22, 2016.

¶ 6        Erie hired a consultant to examine the property and identify

potential tenants, including King Soopers.  King Soopers had a

location in Lafayette, but it had developed a larger store prototype.

In early 2016, Lafayette became aware that King Soopers might

relocate to open a larger store.  In February 2016, Lafayette

---

[1] Lafayette argued in the supplemental briefing requested by this court that the property still belongs to TOEURA, a statutory body. However, the record (and the parties' previous briefing) indicates that Erie annexed the property as of 2015 so the property is currently within the boundaries of Erie, a statutory town.

engaged in discussions to keep King Soopers (and its corresponding tax revenue) in Lafayette. Lafayette offered King Soopers a potential development site north of the Walmart on the west side of Highway 287.

¶ 7    In May 2016, Lafayette's city council passed an ordinance declaring, "[a]cquisition of [part of Nine Mile Corner] is necessary for the public purpose of open space and benefits associated with open space, as well as preservation of Lafayette's local and unique character, and buffering of Lafayette from development activities in neighboring communities." Lafayette determined it would condemn twenty-two acres of the southern portion of Nine Mile Corner to create an open space community buffer and leave the remaining twenty-three acres of Nine Mile Corner for Erie.



2

¶ 8    After attempting to purchase the property,[3] Lafayette filed its

petition in condemnation and motion for immediate possession in

July 2016.  Erie responded by filing a motion to dismiss arguing

that Lafayette's condemnation lacked a proper public purpose,

thereby depriving the court of jurisdiction.  After a two-day

[2] The Nine Mile Corner property: the blue/shaded area reflects the twenty-two acres Lafayette sought to condemn, and the white area reflects the twenty-three acres left for Erie.
[3] The record is sparse regarding Lafayette's purchase efforts.  Erie's answer brief asserts that Lafayette never attempted to negotiate the size of the condemnation parcel, but does not assert that Lafayette never attempted a purchase.  Lafayette contends it tried to purchase the property before starting condemnation proceedings, but denies it was obligated to negotiate the size of the condemnation parcel.

evidentiary hearing, the district court granted Erie's motion to dismiss, thus preventing Lafayette from condemning the property.

¶ 9    Lafayette appeals, arguing that its condemnation had a proper public purpose and that no bad faith motivated its condemnation decision. Although we agree that condemnation to create an open space community buffer could be a proper public purpose, the record here supports the district court's findings that Lafayette's condemnation decision fails because it was motivated by bad faith. Thus, we affirm the district court's judgment.

## II.    Standard of Review

¶ 10    The parties dispute the applicable standard of review. In examining the public purpose for a condemnation, we examine whether the stated public purpose is supported by the record. *City & Cty. of Denver v. Block 173 Assocs.*, 814 P.2d 824, 828-29 (Colo. 1991). Allegations of bad faith are also reviewed by reference to the record. *Id.*; *see also Glenelk Ass'n, Inc. v. Lewis*, 260 P.3d 1117, 1120 (Colo. 2011) (in a private condemnation action, the district court's findings of facts are reviewed under the clearly erroneous standard); *Denver W. Metro. Dist. v. Geudner*, 786 P.2d 434, 436

(Colo. App. 1986) (recognizing that even if there is an incidental public benefit, a court may still find bad faith).[4]

### III.   Open Space Buffer as Public Purpose

¶ 11    First, we consider whether a municipality may condemn property belonging to a statutory town for an open space buffer under article XX of the Colorado Constitution.  As a general matter, *Town of Telluride v. San Miguel Valley Corp.*, 185 P.3d 161 (Colo. 2008), concluded that open space buffers can serve a valid public purpose.

### A.   Condemnation Law

¶ 12    Home rule municipalities may "condemn property for any lawful, public, local, and municipal purpose."  *Id.* at 164 (discussing Colo. Const. art. XX); *see also Kelo v. City of New London*, 545 U.S. 469, 478 (2005) (recognizing that a governmental entity may not take property "under the mere pretext of a public purpose").[5]  It is

---

[4] The parties agreed in their briefing that there is not a specific definition of "bad faith" in the case law; rather it is a fact specific inquiry into whether a condemning entities' proffered motives for a condemnation are legitimate.

[5] Decisions before and after the 2005 decision in *Kelo v. City of New London*, 545 U.S. 469, 478 (2005), have examined the motives of condemning authorities when considering whether a taking was

true "the powers of a home rule or statutory municipality to acquire by condemnation property outside of its territorial boundaries [must] be limited to the narrowest extent permitted by article XX of the state constitution," § 38-1-101(4)(a)(II), C.R.S. 2017, but our supreme court has stated more than once that the powers enumerated in article XX are illustrative not exclusive, *see Telluride*,

---

pretextual. *See Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 23 n.13 (1st Cir. 2010) (noting that the court was not foreclosing a later as-applied challenge to a condemnation as a "mere pretext of a public purpose" (quoting *Kelo*, 545 U.S. at 478)); *Franco v. Nat'l Capitol Revitalization Corp.*, 930 A.2d 160, 171 (D.C. Cir. 2007) (acknowledging the potential for a claim that an alleged "public purpose is a pretext" to a condemnation (quoting *Kelo*, 545 U.S. at 478)); *Cty. of Hawaii v. C & J Coupe Family Ltd. P'ship*, 198 P.3d 615, 647-49 (Haw. 2010) (noting that courts must consider evidence of an illegitimate purpose and determine whether the rationale was "a mere pretext for its actual purpose to bestow a private benefit"); *Middletown Twp. v. Lands of Josef Seegar Stone*, 939 A.2d 331, 337-38 (Pa. 2007) ("In considering whether a primary public purpose was properly invoked, this [c]ourt has looked for the 'real or fundamental purpose' behind a taking[,]" meaning that "the government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification.") (citation omitted); *see also Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1229 (C.D. Cal. 2002) ("Courts must look beyond the government's purported public use to determine whether that is the genuine reason or if it is merely pretext."); *99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F. Supp. 2d 1123, 1129 (C.D. Cal. 2001) ("No judicial deference is required . . . where the ostensible public use is demonstrably pretextual.").

185 P.3d at 166; *Town of Glendale v. City & Cty. of Denver*, 137 Colo. 188, 194, 322 P.2d 1053, 1056 (1958) (allowing Denver to condemn property belonging to Glendale for the construction of sewer lines because "[a]lthough sewers are not expressly mentioned in the Constitution, the powers enumerated therein are by way of illustration and not of limitation").

¶ 13    In a condemnation action, "the burden of proof is on the condemning entity to demonstrate, by a preponderance of the evidence, that the taking of private property is for a public use[.]" § 38-1-101(2)(b).

¶ 14    In *Telluride*, our supreme court concluded that "article XX grants home rule municipalities the power to condemn property, within or outside of territorial limits, for any lawful, public, local, and municipal purpose[,]" because "the list of purposes in section 1 [of article XX] is not comprehensive." 185 P.3d at 166. But, *Telluride* did not adopt a uniform rule for what constitutes a lawful public purpose "because of the difficulty of capturing the permissible range of local and municipal projects with a static

test."[6]  *Id.* at 167.  On the facts before it, the *Telluride* court concluded that open space and parks were a valid public purpose for which a municipality could condemn extraterritorially.  *Id.* at 167-68.

¶ 15    Section 1 of article XX also provides, "[a municipality] shall have the power, within or without its territorial limits, to . . . condemn . . . in whole or in part, and everything required therefore, for the use of said city and county and the inhabitants thereof[.]"  Colo. Const. art. XX, § 1; *cf. City of Aurora v. Commerce Grp. Corp.*, 694 P.2d 382, 385 (Colo. App. 1984) ("[T]here is a presumption against implication of authority for eminent domain not expressly granted[.]").  Thus, a municipality would not

[6] In *Town of Telluride v. San Miguel Valley Corp.*, 185 P.3d 161 (Colo. 2008), the court did not analyze the *Public Service Co. of Colorado v. Shaklee*, 784 P.2d 314 (Colo. 1989), factors.  It is unclear if the court's failure to reference *Shaklee* is meaningful.  But here, the district court referenced and considered the *Shaklee* factors: (1) the physical condition of the property; (2) the community's needs; (3) the character of the benefit the project would confer on the community; and (4) the necessity of the improvement for the development of state resources.  *Shaklee*, 784 P.2d at 318.  Because *Telluride*, 185 P.3d at 164-68, suggests that extensive discussion of these factors may not be necessary, the district court's discussion was sufficient.  In any event, we can affirm the district court on any ground supported by the record.  *Taylor v. Taylor*, 2016 COA 100, ¶ 31.

necessarily be prohibited from exercising its *legitimate* condemnation authority to take land owned by a neighboring statutory town, if a valid public purpose exists.[7]  *See City of Thornton v. Farmers Reservoir & Irrigation Co.*, 194 Colo. 526, 537, 575 P.2d 382, 391 (1978) ("[*Beth Medrosh Hagodol v. City of Aurora*, 126 Colo. 267, 248 P.2d 732 (1952),] recognizes that Colo. Const. [a]rt. XX grants to home rule municipalities ample power to acquire by condemnation property already devoted to a public use."); *Town of Glendale*, 137 Colo. at 195, 322 P.2d at 1057.  *But see Town of Parker v. Colo. Div. of Parks & Outdoor Recreation*, 860 P.2d 584, 586 (Colo. App. 1993) ("The right to take property already dedicated to a public use for another public use exists in some cases, but such rights must be by specific grant of authority."); *see also CAW Equities, L.L.C. v. City of Greenwood Village*, 2018 COA 42M, ¶¶ 27-28.

---

[7] After *Telluride*, a bill to limit the ability of a home rule municipality to acquire real property outside its territorial boundaries via condemnation was introduced to the General Assembly.  H.B. 09-1258, 67th Gen. Assemb., 1st Sess. (Feb. 3, 2009).  However, the bill did not pass.

## B. Bad Faith in the Condemnation Context

¶ 16    Lafayette argues that (1) there was no bad faith or fraud behind its decision to condemn the property and (2) its finding of necessity cannot be disturbed. We disagree with both contentions.

¶ 17    Courts may review condemnation actions to determine if "the essential purpose of the condemnation is to obtain a public benefit." *Geudner*, 786 P.2d at 436. Even if a condemnation decision is motivated in part by a public benefit, "the existence of an incidental public benefit does not prevent a court from finding 'bad faith' and invalidating a condemning authority's determination that a particular acquisition is necessary." *Id.* Bad faith factors into the lawful public purpose analysis. Without judicial review of condemnation actions, there would be no end to one entity subverting another entity's condemnation action by initiating one of its own. *See Schroeder Invs., L.C. v. Edwards*, 301 P.3d 994, 999 (Utah 2013) ("[O]ne of the primary policies underlying the 'more necessary public use' provision is the avoidance of serial takings.") (citation omitted); *Lake Cty. Parks & Recreation Bd. v. Ind.-Am. Water Co.*, 812 N.E.2d 1118, 1123 (Ind. Ct. App. 2004) ("[A]bsent

the prior public use doctrine, property could be condemned back and forth indefinitely.").

¶ 18    In *Telluride*, however, the court noted that the trial court found that Telluride's condemnation was not motivated by bad faith. *Town of Telluride*, 185 P.3d at 169 n.7. Thus, on review, the court "accept[ed] as fact that Telluride sought the condemnation pursuant to [a] constitutionally valid purpose." *Id.*

¶ 19    Further, "[t]he issues of necessity and public purpose are 'closely related and, to some extent, interconnected.'" *Geudner*, 786 P.2d at 436 (quoting *Thornton Dev. Auth. v. Upah*, 640 F. Supp. 1071, 1076 (D. Colo. 1986)). "While the existence of a public purpose is always subject to judicial review, the necessity of an acquisition of a specific parcel of property may only be reviewed by a court upon a showing of bad faith." *Id.* Thus, if bad faith is at issue, courts may look behind an entity's stated condemnation purpose and finding of necessity.

C.    Analysis of the Legality of the Asserted Purpose

¶ 20    Lafayette's argument hinges on its belief that because the Lafayette city council determined this condemnation was necessary, the district court cannot look behind that determination to see if it

13

was motivated by bad faith.  This is incorrect.  It is true that "[a] determination of necessity . . . is not reviewable absent a showing of bad faith or fraud."  *Block 173 Assocs.*, 814 P.2d at 829.  But here, Erie's motion to dismiss alleged that Lafayette's condemnation was motivated by bad faith and was not for a lawful public purpose.

¶ 21     To rebut Lafayette's claim that the taking was for a public purpose, § 38-1-101(2)(b), Erie presented evidence of Lafayette's alleged bad faith during the two-day evidentiary hearing.  Because Erie sufficiently showed that Lafayette's decision could have been motivated by bad faith, the district court appropriately reviewed Lafayette's finding of necessity.  *See Block 173 Assocs.*, 814 P.2d at 828-29 ("In examining the stated public purpose for a condemnation, we look to whether the stated public purpose is supported by the record.").

¶ 22     *Pheasant Ridge Associates Ltd. Partnership v. Town of Burlington,* 506 N.E.2d 1152, 1154 (Mass. 1987), presented a similar question on "the lawfulness of the town's taking in light of the plaintiffs' assertion that the taking was made in bad faith[.]"  The court stated that "[b]ad faith in the use of the power of eminent domain . . . includes the use of the power of eminent domain solely

14

for a reason that is not proper, although the stated public purpose or purposes for the taking are plainly valid ones." *Id.* at 1156. That is precisely the situation here. The stated public purpose of an open space buffer is valid, but blocking Erie's planned development — planning that predated Lafayette's condemnation petition — is not lawful. *See, e.g.*, *R.I. Econ. Dev. Corp. v. Parking Co., L.P.*, 892 A.2d 87, 104 (R.I. 2006) (concluding that condemnation of a temporary easement was inappropriate where it was motivated by a desire for increased revenue and was not undertaken for a legitimate public purpose). Because the district court's determination — that Lafayette's primary interest in the property was to interfere with Erie's proposed commercial development — enjoys record support, we defer to those factual findings. *See Glenelk Ass'n*, 260 P.3d at 1120; *Bd. of Cty. Comm'rs v. Kobobel*, 176 P.3d 860, 866 (Colo. App. 2007) (finding no valid public purpose for challenged condemnation of land used as a public road to a private cemetery).

¶ 23    Although TOEURA submitted its land use application in October 2016 (after Lafayette passed its condemnation ordinance), Erie had begun sufficient work to develop the site including hiring a

15

developer, identifying potential tenants, and signing a development agreement. As in *Pheasant Ridge*, Lafayette filed its action to condemn the property only after Erie's development plans began to take shape. *See* 506 N.E.2d at 1157 ("The matter of taking the subject site came forward only when the plaintiffs' proposal became known."). "Although not controlling, the absence of any prior town interest in the site or its neighborhood is instructive on the matter of good faith." *Id.* At the evidentiary hearing, Lafayette's city administrator tried to explain that Lafayette's failure to include the property on previous open space and trail priority (PROST) lists from 2008 to 2016 did not reflect a lack of interest in the property. He suggested that the PROST lists reflected properties Lafayette believed Boulder County would financially partner with Lafayette to acquire, but that Lafayette had always been interested in the subject property. The district court judge heard all arguments and evidence and reasonably concluded that Erie's explanation — that Lafayette had no interest in the property until it learned of Erie's proposed development — was more credible.

¶ 24    Erie also presented evidence that without the southern twenty-two acres, the value of the property was severely diminished

16

and developing the remaining portion could be foreclosed. The district court was within its discretion to consider the respective economic impacts on Erie and Lafayette of losing the property and King Soopers as a tenant, *see Kelo*, 545 U.S. at 490 (concluding that a taking in furtherance of an economic development plan constitutes a public use), and to determine Lafayette invoked its condemnation power improperly — especially because Lafayette was unable to explain how it determined that the condemned twenty-two acres were necessary, *see Piedmont Triad Reg'l Water Auth. v. Sumner Hills Inc.*, 543 S.E.2d 844, 847 (N.C. 2001) (stating that the condemning entity must explain what portion of the condemned property is actually for the asserted public purpose and what portion of the land is "in excess of the public purpose" to prevent "the condemner from taking the entire tract of land by [asserting] that the property is needed for a public purpose *without* defining that segment of the land actually necessary"). Here, Lafayette engaged in extensive commercial development along Highway 287 but ignored Nine Mile Corner — until King Soopers threatened relocation. Finally, Lafayette presented no evidence showing why the setback incorporated in

17

Erie's development plans would be insufficient to serve as a community buffer.

¶ 25     Because Erie, as the property owner, met its burden of showing bad faith, *see Goltra*, 66 P.3d at 174, the district court properly examined Lafayette's finding of necessity to determine, with record support, that the taking to establish an open space community buffer was pretextual and was not a lawful public purpose. *See Glenelk Ass'n*, 260 P.3d at 1120. The court also indicated that Lafayette's public officials were highly motivated to keep King Soopers — and the corresponding tax revenue — within Lafayette. Accordingly, the record amply supports the district court's findings. *See id.*

## IV.   Attorney Fees and Costs

¶ 26     Because the district court has not issued an order on Erie's motion for attorney fees, we do not review the issue. *See Weston v. T & T, LLC*, 271 P.3d 552, 561 (Colo. App. 2011) ("The trial court must make sufficient findings, so that, when they are considered together with the record, the reviewing court can conduct a meaningful review.").

18

## V.    Conclusion

¶ 27    Because Erie sufficiently showed that Lafayette's condemnation decision was made in bad faith and was thus not for a lawful public purpose, we affirm the district court's judgment.

JUDGE ASHBY concurs.

JUDGE FURMAN specially concurs.

JUDGE FURMAN, specially concurring.

¶ 28    I agree with my colleagues that Erie sufficiently showed that Lafayette's condemnation decision was made in bad faith and was thus not for a lawful public purpose.  That was the focus of the litigation in the district court.  I write separately to point out what I consider to be a more important question that we need not answer: Whether the Colorado Constitution, or some other authority, authorizes one home rule municipality to exercise its eminent domain power over public land owned by a statutory town.  The parties in the district court appear to have assumed that such authority exists; so the focus of the litigation was over whether Lafayette had a proper public purpose in acquiring the land.  My agreement with the division is on this narrow basis.